# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DELLA SHAW, SHERLYNE TURNER, BERTHA JOHNSON and MARTHA RAND, <br><br> Plaintiffs, <br><br> v. <br><br> CHEROKEE MEADOWS, LP, CARLAND GROUP, LLC, RED BUD CONTRACTORS, LLC, CARLAND PROPERTIES, LLC, and BLACKLEDGE & ASSOCIATES, <br><br> Defendants. | Case No. 17-CV-610-GKF-JFJ |

## OPINION AND ORDER

This matter comes before the court on the Partial Motion to Dismiss Counts 3, 4 and 5 of Plaintiffs' Complaint for Failure to State a Claim Upon Which Relief May be Granted [Doc. No. 11] of defendant Blackledge & Associates. For the reasons below, the motion is granted in part and denied in part.

## I.  Allegations of the Complaint

Relevant to Blackledge's motion to dismiss, the Complaint alleges the following facts. Plaintiffs are females, over the age of sixty-two, who each have a physical or mental limitation that substantially limits one or more major life functions. [Doc. No. 2, ¶ 56]. Plaintiffs are tenants of the Cherokee Meadows Apartments, located at approximately Pine and Peoria Avenues in Tulsa, Oklahoma. [*Id.* ¶¶ 11 and 57].

Cherokee Meadows Apartments is a forty-eight (48) unit multi-family, affordable housing project (the "Project") for persons aged sixty-two or older developed in 2016 by Carland Group

LLC. [*Id.* ¶¶ 62 and 68-69]. Blackledge, a private Oklahoma company, provided architectural and design services for the Project. [*Id.* ¶ 67].

Carland Group, LLC applied for and received more than $6,250,000.00 in Low Income Housing Tax Credits from the Oklahoma Housing Finance Agency and HOME Investments Partnership Program funding from the City of Tulsa related to the Project. [*Id.* ¶¶ 70-71]. The Low Income Housing Tax Credit program is a federally funded affordable housing program authorized by the Internal Revenue Act, 26 U.S.C. § 42, and administered by the Oklahoma Housing Finance Agency in Oklahoma. [*Id.* ¶ 24]. Recipients must agree to comply with federal civil rights laws that require equal access and opportunity to persons with disabilities, including the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, and the Fair Housing Amendments Act of 1988. [*Id.* ¶ 25]. Similarly, all new construction projects funded with HOME funds must satisfy the accessibility requirements of part 8 of title 24 of the Code of Federal Regulations, which implements section 504 of the Rehabilitation Act of 1973; Titles II and III of the Americans with Disabilities Act, implemented as parts 35 and 36 of title 28 of the Code of Federal Regulations; and 24 C.F.R. § 100.205, the implementing regulation of the Fair Housing Act. [*Id.* ¶ 26].

The Project includes artificial barriers—including curbs, unpowered garage doors, walking paths, toilets, and showers—that exclude persons with disabilities and do not comply with the Fair Housing Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Uniform Federal Accessibility Standards. [*Id.* ¶¶ 1, 4-12]. Defendants refuse to grant reasonable modification requests. [*Id.* ¶ 149].

## II. Motion to Dismiss Standard

In considering a motion to dismiss under FED. R. CIV. P. 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief can be granted. A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to make out the claim. *Id.* at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007) (quoting *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007)).

## III. Analysis

Blackledge moves to dismiss plaintiffs' claims for violation of section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794 (count 3); violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 (count 4); and breach of the Land Use Restriction Agreement (count 5). The court will separately consider each claim.

### A. *Count 3 – Violation of Section 504 of the Rehabilitation Act of 1974*

Section 504 of the Rehabilitation Act provides, in relevant part, as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such

regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

29 U.S.C. § 794(a). To establish a prima facie case for discrimination in violation of the Rehabilitation Act, plaintiffs must establish: (1) that they are disabled under the Act; (2) that they would be "otherwise qualified" to participate in the program; (3) that the program receives federal financial assistance; and (4) that the program has discriminated against the plaintiff. *Wilkerson v. Shinseki,* 606 F.3d 1256, 1262 (10th Cir. 2010). Blackledge seeks dismissal of the Rehabilitation Act claim based solely on the claim's third element, arguing that Blackledge did not receive federal financial assistance.

The parties do not cite, nor has the court discovered in its research, authority specifically addressing whether receipt of Low Income Housing Tax Credits and HOME Investments Partnership Program funding related to a project renders all contractors or subcontractors on the project recipients of "federal financial assistance" for purposes of Rehabilitation Act liability. In the absence of such authority, the Supreme Court requires the court to look to the terms of the underlying grant statute. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986). Plaintiffs rely on Blackedge's alleged receipt of Low Incoming Housing Tax Credits and HOME Investments Partnership Program funding.

Low Income Housing Tax Credits are specific to the individual tax payer. 26 U.S.C. § 42 (low-incoming housing credit). Plaintiffs allege the following: Carland Group LLC developed the Project. [Doc. No. 2, ¶ 62]. Blackledge provided architectural and design services at the Project [*Id.* ¶ 67]. Carland Group LLC applied for Low Income Housing Tax Credits from the Oklahoma Housing Finance Agency to build the Project. [*Id.* ¶ 70]. Carland Group LLC also received HOME

funding from the City of Tulsa. [*Id.*]. Carland Ground LLC was eventually awarded more than $6,250,000 in federal tax credits and HOME funds related to the Project. [*Id.* ¶ 71].

The Complaint includes no allegations that Blackledge applied for or received Low Income Housing Tax Credits. Thus, receipt of Low Income Housing Tax Credits cannot provide the basis of plaintiffs' Rehabilitation Act claim.

As for the HOME Investments Partnership Program, the grant statute is contained in Title II of the Cranston-Gonzalez National Affordable Housing Act, 42 U.S.C. §§ 12701 *et al.* Congress articulated two of the purposes of the National Affordable Housing Act as being:

> (3) To provide participating jurisdictions, on a coordinated basis, with the various forms of Federal housing assistance . . . needed –
>
> (A) to expand the supply of decent, safe, sanitary, and affordable housing;
>
> (B) to make new construction, rehabilitation, substantial rehabilitation, and acquisition of such housing feasible; and
>
> (C) to promote the development of partnerships among the Federal Government, States and units of general local government, private industry, and nonprofit organizations able to utilize effectively all available resources to provide more of such housing;
>
> ***
>
> (8) to increase the investment of private capital and the use of private sector resources in the provision of decent, safe, sanitary, and affordable housing;

42 U.S.C. § 12722(3), (8). To that end, Congress authorized the Secretary of Housing and Urban Development "to make funds available to participating jurisdictions for investment . . . ." *Id.* § 12741. Funds are disbursed to participating state and local government units, *Id.* §§ 12746-12747, which then distribute the funds for eligible uses. *Id.* §§ 12742 and 12752. Eligible uses include new construction costs, *Id.* § 12742(a), which include "[a]rchitectural, engineering, or related

professional services required to prepare plans, drawings, specifications, or work write-ups."[1] 24 C.F.R. § 92.206(d). Congress directed the participating State and local governments to "make all reasonable efforts . . . to maximize participation by the private sector, including nonprofit organizations and for-profit entities, in the implementation of the jurisdiction's housing strategy, including participation in the financing, development, rehabilitation and management of affordable housing." *Id.* § 12751.

Based on the plain statutory language of the National Affordable Housing Act, it is clear that Congress intended for private entities to receive federal HOME funds, including for costs associated with architectural, engineering, or related professional services.

Blackledge argues that it cannot be liable because it did not *directly* receive federal financial assistance or funds on the Project. *See* [Doc. No. 11, p. 5]. However, the Supreme Court has declined to recognize a distinction between direct and indirect recipients of federal funds. *See Paralyzed Veterans of Am.*, 477 U.S. at 606-07. Nor is the court persuaded by Blackledge's characterization of itself as a mere beneficiary of the federal funds. *See Paralyzed Veterans of Am.*, 477 U.S. at 607 ("The statute covers those who receive the aid, but does not extend as far as those who benefit from it."). Again looking to the terms of the underlying grant statute, the National Affordable Housing Act, low-income Americans receiving affordable housing are the intended beneficiaries—not contractors who indirectly receive federal funds.

Such an interpretation is also consistent with HUD departmental regulations regarding the Rehabilitation Act. *See DeVargas v. Mason & Hanger-Silas Mason Co.,* 911 F.2d 1377, 1383 (10th Cir. 1990). The Rehabilitation Act applies with respect to programs and activities under the

---

[1] Congress directed the Secretary of Housing and Urban Development to issue regulations to implement the provisions of the National Affordable Housing Act. 42 U.S.C. § 12725.

National Affordable Housing Act, including its implementing regulations at part 8, title 24 of the Code of Federal Regulations. 42 U.S.C. § 12832; 24 C.F.R. § 92.350(a) (applying federal requirements of part 5, title 24 of the Code of Federal Regulations to participants in HOME program); 24 C.F.R. § 5.105(a) (applying requirements of Rehabilitation Act and regulations to all HUD programs). Section 3 of part 8, title 24 of the Code of Federal Regulations—the implementing regulations for the Rehabilitation Act to HUD programs—defines "[f]ederal financial assistance" as "any assistance provided or otherwise made available by the Department through any grant, loan, contract or any other arrangement, in the form of: (a) Funds;." 24 C.F.R. § 8.3. "Recipient" means

> any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended for any program or activity *directly or through another recipient*, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

*Id.* (emphasis added). Thus, the HUD implementing regulation does not distinguish between direct and indirect receipt of federal funds. *See Bishop v. Children's Ctr. for Developmental Enrichment,* No. 08-CV-766, 2011 WL 4337088, at **7-9 (S.D. Ohio Sept. 15, 2011) (construing similar regulation to conclude that subcontractor of direct recipient was also recipient of federal financial assistance).[2]

---

[2] Blackledge argues that *Bishop* is distinguishable because "the *Bishop* court only found Section 504 applies to subcontractors of a recipient of federal grant funds when an entire corporation is engaged in the business of providing education." [Doc. No. 33, p. 4]. However, like the HUD implementing regulation at 24 C.F.R. § 8.3, the regulation in *Bishop* also included "[t]he entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended" in the definition of "program or activity." 34 C.F.R. § 104.3(k); 24 C.F.R. § 8.3. The Project constitutes a geographically separate facility to which federal financial assistance was extended. Nor is the court persuaded by Blackledge's assertion that *Bishop* concluded that the entity directly received federal assistance, as no distinction exists between direct and indirect receipt of financial assistance under the Rehabilitation Act.

Finally, the court is not persuaded by the cases Blackledge cites. Blackledge primarily relies upon the Seventh Circuit's decision in *Grzan v. Charter Hosp. of Nw. Indiana*, 104 F.3d 116, 120 (7th Cir. 1997), in which the court concluded that "[e]mployees of the recipients of federal financial assistance are not in themselves the recipients of such assistance." Unlike employees, who often have no control over whether their employer accepts federal funds and the obligations attendant thereto, Blackledge independently entered into a contract to provide architectural services—presumably including satisfaction of federal, state, and municipal building requirements—for a project that received federal funds. Nor is the court persuaded by *United States v. LaHue*, 170 F.3d 1026, 1029-30 (10th Cir. 1999), as the Tenth Circuit was interpreting a federal criminal statute, 18 U.S.C. § 666, and noted the "inherent policy differences between these criminal and civil statutes." *Id.* at 1029.

Although questions exist as to plaintiffs' ability to *prove* actual receipt of federal funds by Blackledge, that is not the court's concern at this stage of the litigation. For now, the court merely concludes that the Complaint includes sufficient facts to state a plausible claim for relief under the Rehabilitation Act against Blackledge based on receipt of HOME funds. Accordingly, Blackledge's motion to dismiss count 3 – violation of section 504 of the Rehabilitation Act of 1974, 29 U.S.C. § 794, is denied.

   B.   *Count 4 – Violation of the Americans with Disabilities Act, 42 U.S.C. § § 12132*

Section 12132, which is included in Title II of the Americans with Disabilities Act ("ADA"), provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a prima facie claim under the statute, plaintiffs must prove: (1) that they are qualified

individuals with disabilities; (2) that they were either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or were otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of plaintiffs' disabilities. *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1295 (10th Cir. 2016). Blackledge argues that plaintiffs' Title II ADA claim must be dismissed because Blackledge is not a "public entity" as required by the statute. In response, plaintiffs assert that Blackledge's role in the Project was to design and oversee the construction of ADA compliant housing for Oklahoma Housing Finance Agency qualifying individuals and, therefore, "Blackledge's actions are one with the state housing administration public entity." [Doc. No. 29, p. 11].

It is well-established that "[o]nly public entities are subject to Title II." *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773 (2015). The ADA defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49)." 42 U.S.C. § 12131(1). It is undisputed that Blackledge is not a State or local government, state department, state agency, special purpose district, or the National Railroad Passenger Corporation. Thus, the court construes plaintiffs' response as asserting that Blackledge acted as an "instrumentality of [the] State" through its work on the Project.

A number of courts have considered whether a private entity constitutes a "public entity," or more specifically, "instrumentality of [the] State," by virtue of contracting with or providing services to a public entity, most often in the context of prisons. The majority of these courts conclude that "a private corporation is not a public entity merely because it contracts with a public

entity to provide some service." *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *see also Green v. City of New York,* 465 F.3d 65, 79 (2d Cir. 2006) (construing "instrumentality of [the] State" as "a creature of a state or municipality" and therefore concluding "[a] private hospital performing services pursuant to a contract with a municipality even if it does so according to the municipality's rules and under its direction, is not a creature of any governmental entity"); *Wilkins-Jones v. Cnty. of Alameda,* 859 F. Supp. 2d 1039, 1046 (N.D. Cal. 2012) ("The majority of courts—including the only circuit courts to have reached the question—have held that Title II does not apply to government contractors."); *Maxwell v. S. Bend Work Release Ctr.*, 787 F. Supp. 2d 819, 822 (N.D. Ind. 2011) ("[A] private company does not become a public entity for Title II purposes merely because it has a business or contractual relationship with a public entity."); *Fesenmeyer v. City of Kansas City*, No. 15-00850-CV-W-DGK, 2016 WL 3167264, at *2 (W.D. Mo. June 6, 2016) (engineering and construction contracts insufficient to render private companies "public entities" or "instrumentalities of a State").

Plaintiffs urge the court to adopt the reasoning of Eleventh Circuit Judge Rosemary Barkett's dissent in *Edison*, wherein Judge Barkett opined that "when a company *takes the place of the state* in performing a function within the exclusive province of the state, that company cannot be permitted to avoid the requirements of the law governing that state function." *Edison*, 604 F.3d at 1312 (Barkett, J., dissenting) (emphasis in original). However, in an unpublished decision interpreting whether Title II of the ADA applies to private prisons, the Tenth Circuit considered the reasoning of Judge Barkett's dissent in *Edison* but ultimately agreed with the reasoning of the Second Circuit in *Green* that "'instrumentality' refers to a traditional government unit or one created by a government unit." *Phillips v. Tiona*, 508 F. App'x 737, 749-54 (10th Cir. 2013). Further, unlike a prison, which "can *never* be operated independently of the government," a

housing development can be operated independently. *Cf. Edison*, 604 F.3d at 1311 ("Absent authorization from and a contract with a government, [defendant] could not—nor could any other private entity—establish and operate a prison."). Accordingly, the court sees no reason to deviate from the majority rule in this case.

Plaintiffs allege Blackledge is a private Oklahoma company. [Doc. No. 2, ¶ 67]. Because a private company does not become a public entity for purposes of Title II merely by virtue of a business or contractual relationship with a public entity, Blackledge is not a "public entity" as a result of its work on the Project. *See* [Doc. No. 2]. Thus, Blackledge cannot be subject to liability under Title II of the ADA, and the Complaint fails to state a plausible claim for violation of Title II against Blackledge. Blackledge's motion to dismiss count 4 – violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 is granted.

### C. Count 5 – Breach of the Land Use Restriction Agreement

"To recover under a claim for breach of contract in Oklahoma, a plaintiff must show: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." *Choate v. Lawyers Title Ins. Corp.*, 385 P.3d 670, 678 (Okla. Civ. App. 2016). It is fundamental that "contracts are binding only upon those who are parties thereto." *Drummond v. Johnson,* 643 P.2d 634, 639 (Okla. 1982) (footnote omitted). Blackledge argues it is not a party to the relevant contract—the Land Use Restriction Agreement—and therefore it cannot be bound by the contract.

However, the Complaint alleges that *all* defendants, including Blackledge, entered into the LURA with the Oklahoma Housing Finance Agency. [Doc. No. 2, ¶ 158 ("The terms of the Land Use Restriction Agreement ("LURA") entered into between the Defendants and the OHFA are enforceable by the Plaintiffs as third party beneficiaries.")]. Under Rule 12(b)(6), the court must accept this allegation as true. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (in

considering motion to dismiss, the court must "accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff"). Although Blackledge argues that paragraph 27 of plaintiffs' Complaint contradicts plaintiffs' claim that all defendants were parties to the contract, paragraph 27 relates to the Regulatory Agreement for Low-Income Housing Tax Credits Creating Restrictive Covenants, not the LURA. [Doc. No. 2, ¶ 27].

The court is not bound to accept as true allegations of the Complaint contradicted by documents central to plaintiffs' claim. *See Prissert v. Emcore Corp.*, 894 F. Supp. 2d 1361, 1368 (D.N.M. 2012). However, neither party provided the court a complete copy of the LURA. In response to Blackledge's motion to dismiss, plaintiffs provided the court two separate certifications signed by Blackledge that were purportedly incorporated into the LURA. *See* [Doc. No. 29-1 and 29-2]. Blackledge argues that the court should not consider the certifications because the related allegations were not set forth in plaintiffs' Complaint. *See* [Doc. No. 33, pp. 1-2]. However, as previously stated, the Complaint alleges that that defendants, collectively, breached the LURA. [Doc. No. 2, ¶ 158]. When ruling on a motion to dismiss, the court can "consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute [their] authenticity.'" *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). The LURA is therefore central to plaintiffs' claim and the court may consider documents incorporated therein.[3] Based on the court's review, the certifications do not *preclude* Blackledge from being a party to the LURA, as the documents reference the Project. [Doc. No. 29-1 and 29-2]. Thus, viewing the allegations in the light most favorable to the

---

[3] For purposes of this motion only, the court assumes that the LURA, in fact, incorporated the certifications.

plaintiffs, the Complaint states a plausible breach of contract claim against Blackledge, and Blackledge's motion to dismiss count 5 is denied.

## IV. Conclusion

WHEREFORE, the Motion to Dismiss Counts 3, 4 and 5 of Plaintiffs' Complaint for Failure to State a Claim Upon Which Relief May be Granted [Doc. No. 11] of defendant Blackledge & Associates is granted in part and denied in part. The motion is granted as to count 4 – violation of the Americans with Disabilities Act, 42 U.S.C. § 12132. The motion is otherwise denied.

DATED this 8th day of June, 2018.

*(signature)*
GREGORY K. FRIZZELL, CHIEF JUDGE