# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DELLA SHAW, SHERLYNE TURNER,       )
BERTHA JOHNSON, and MARY RAND,     )
                                   )
    Plaintiffs,                    )
                                   )
v.                                 )    Case No. 17-CV-610-GKF-JFJ
                                   )
CHEROKEE MEADOWS, LP;              )
CARLAND GROUP, LLC; REDBUD         )
CONTRACTORS, LLC; CARLAND          )
PROPERTIES, LLC; and BLACKLEDGE &  )
ASSOCIATES,                        )
                                   )
    Defendants.                    )
_____)
CHEROKEE MEADOWS, LP and           )
CARLAND GROUP, LLC,                )
                                   )
    Third-Party Plaintiffs,        )
                                   )
v.                                 )
                                   )
CRAFTON TULL & ASSOCIATES, INC.,   )
                                   )
    Third-Party Defendant.         )

## OPINION AND ORDER

    This matter comes before the court on the Motion for Partial Summary Judgment Against Plaintiff Della Shaw [Doc. 92]; Motion for Partial Summary Judgment Against Plaintiff Mary Rand [Doc. 97]; Motion for Partial Summary Judgment Against Plaintiff Sherlyne Turner [Doc. 103]; and Motion for Partial Summary Judgment Against Plaintiff Bertha Johnson [Doc. 104] of defendants Cherokee Meadows, LP; Carland Group, LLC; and Carland Properties, LLC (collectively, "Carland Defendants"). Additionally, the court considers the Motion for Partial Summary Judgment Against Plaintiff Della Shaw [Doc. 105]; Motion for Partial Summary

Judgment Against Plaintiff Mary Rand [Doc. 106]; Motion for Partial Summary Judgment Against Plaintiff Sherlyne Turner [Doc. 107]; and Motion for Partial Summary Judgment Against Plaintiff Bertha Johnson [Doc. 108] of defendant Redbud Contractors, LLC.

## I.     Background and Procedural History

This case arises from alleged violations of the Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), Rehabilitation Act, and Uniform Federal Accessibility Standards ("UFAS") at the Cherokee Meadows Apartments.  Cherokee Meadows Apartments is a forty-eight (48) unit multi-family, affordable housing community (the "Community") for persons aged sixty-two or older developed in 2016 by Carland Group, LLC and owned by Cherokee Meadows, LP. Plaintiffs allege Carland Properties, LLC is the management company responsible for operations at the Community.  Plaintiffs are tenants of Cherokee Meadows Apartments who allege that the Community includes artificial barriers that exclude persons with disabilities and do not comply with federal statutes.   They further allege that defendants refused to grant reasonable accommodation requests.

Based on these general allegations, the Complaint asserts the following claims against defendants:  (1) failure to design and construct the public use and common use portions of the Community in a readily accessible and usable manner to handicapped persons in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C);  (2) discrimination based on handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f); (3) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (4) discrimination in violation of the Americans with Disabilities Act, 42

U.S.C. § 12132[1] by designing, constructing, and maintaining housing that is not accessible to persons with disabilities; and (5) breach of contract.[2]

The Carland Defendants filed four separate motions, seeking partial summary judgment against each plaintiff as to Count 1, violation of § 3604(f)(3)(C) of the Fair Housing Act; Count 2, discrimination under the Fair Housing Act in violation of § 3604(f); and Count 3, violation of § 504 of the Rehabilitation Act.  Redbud also filed a motion for partial summary judgment against each of the four plaintiffs.  Each of Redbud's four motions "adopt[] and incorporate[] by reference" the motions for partial summary judgment filed by the Carland Defendants as to plaintiffs' Count 2, discrimination under the Fair Housing Act in violation of § 3604(f), and Count 3, violation of § 504 of the Rehabilitation Act.  Unlike the Carland Defendants,  Redbud does not seek summary judgment as to Count 1, violation of § 3604(f)(3)(C).  In addition to the issues raised by the Carland Defendants, however, Redbud also seeks summary judgment as to Count 5, breach of contract. Plaintiff Della Shaw responded to the Carland Defendants' motion and, based upon plaintiffs' request and pursuant to order of this court, Shaw's response is deemed responsive to the motions for partial summary judgment by the Carland Defendants against plaintiffs Rand, Turner, and Johnson, as well as Redbud's motions.  [Doc. 144, p. 4].  The motions are therefore ripe for the court's review.

---

[1] Pursuant to the order of June 8, 2018, the court dismissed the claim for violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 against defendant Blackledge & Associates.  [Doc. 46].

[2] In the motion, the Carland Defendants state "some reference has been made that Plaintiff's claims are also based on race discrimination."  *See* [Doc. 92, p. 17 n.4].  Plaintiffs' response includes no reference to any race discrimination claims, nor does the court construe the Complaint to assert any claims premised on discriminatory conduct based on race.

## II. Evidentiary Issues

Before considering plaintiffs' claims, the court must address certain evidentiary issues raised by the parties.

### A. *Plaintiffs' Objections to the Carland Defendants' Evidence*

In the response, plaintiffs object to the Carland Defendants' reliance on the following exhibits: Exhibit 3, Tulsa Development Authority ("TDA") Board of Commissioners Meeting Executive Director's Report, dated May 2017; Exhibit 4, Affidavit of Terry D. Carty; Exhibit 5, Letter from Chuck Mitchell, P.E. of Third-Party Defendant Crafton Tull to Terry Carty, dated March 28, 2017; Exhibit 6, Letter from Larry K. Blackledge of defendant Blackledge & Associates to Terry Carty, dated April 28, 2017; and Exhibit 13, statements by plaintiff Shaw in a *Tulsa World* news article, dated May 30, 2017. Plaintiffs contend that the cited portions of the exhibits constitute hearsay for which no exception exists and therefore the cited portions are inadmissible. FED. R. EVID. 801.

*First*, the May 2017 TDA Executive Director's Report, the March 28 Crafton Tull letter, and the April 28 Blackledge letter are inadmissible to prove the truth of the matters asserted. The Carland Defendants point to no applicable hearsay exceptions for the documents.[3] Further, even if the documents were admissible pursuant to a hearsay exception, the Carland Defendants fail to

---

[3] With respect to the Crafton Tull and Blackledge letters, the Carland Defendants refer to FED. R. EVID. 803(24), which was transferred to FED. R. EVID. 807 in 1997. However, the Tenth Circuit has said "[t]he residual exception should only be used 'in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice.'" *United States v. Hammers*, 942 F.3d 1001, 1011 (10th Cir. 2019) (quoting *United States v. Dalton*, 918 F.3d 1117, 1133 (10th Cir. 2019)). The Carland Defendants offer no guarantees of trustworthiness nor argument as to why admission of the evidence is necessary in the interest of justice. The court therefore declines to apply the residual exception.

properly authenticate the documents. *See* FED. R. EVID. 803(6) (requiring a certification by the testimony of a custodian or qualified witness, a certification that complies with FED. R. EVID. 902(11) or (12), or statute permitting certification); *Palmer v. Shawnee Mission Med. Ctr., Inc.*, 355 F. Supp. 3d 1003, 1009 (D. Kan. 2018) (requiring authentication of public records subject to FED. R. EVID. 803(8) hearsay exception).[4]

*Second*, with respect to the Carty Affidavit, plaintiffs fail to identify any specific paragraph or averment which they contend is hearsay. To the extent that plaintiffs object to the entirety of the affidavit as hearsay, it is well-established that

> [a]t the summary judgment stage, evidence need not be submitted "in a form that would be admissible at trial." Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (internal citation omitted). For example, Carty, as Manager of the Carland Group, LLC, can properly testify from personal knowledge that Carland Group entered into a Voluntary Compliance Agreement with HUD to remediate the mountable curbs, and that the mountable curbs across driveways were removed and replaced in December 2018 with traditional sloped driveways. [Doc. 92-4, ¶¶ 19-20]. Thus, the court declines to strike the Carty Affidavit in its entirety.

*Third and finally*, Shaw's statements in the *Tulsa World* article are admissible as admissions of a party opponent pursuant to FED. R. EVID. 801(d)(2), as well as a statement of Shaw's then-existing mental, emotional, or physical condition. *See Boyd v. City of Oakland,* 458 F. Supp. 2d 1015, 1050 (N.D. Cal. 2006); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp.

---

[4] For the same reasons, the court does not consider a letter dated January 23, 2017 from the Oklahoma Housing Finance Agency with respect to Turner's unit for the truth of the matter asserted. [Doc. 103-10].

2d 487, 495-96 (D. Del. 2005). In the article, Shaw is directly quoted as stating: "I don't mind living here. It's a nice apartment, and it's easy for my family to get to, easy for the church bus to pick me up. It's nice." [Doc. 92-13, p. 3]. During her deposition, Shaw testified generally that the article reflected her responses to the interviewer's questions. [Doc. 92-2, pp. 102:9 to 107:4]. Thus, Shaw's statement, as directly quoted in the *Tulsa World* article, is admissible. However, the remainder of the article is hearsay. *Welch v. City of Albuquerque,* No. CIV-11-00700-KG-SCY, 2016 WL 8809479, at *3 (D.N.M. May 13, 2016) ("Newspaper and magazine articles and reports or other media are, generally, inadmissible hearsay.").

B.      *Carland Defendants' Objections to Plaintiffs' Evidence*

In their reply, the Carland Defendants object to plaintiffs' reliance on two items of evidence: (1) Letter of Findings of Noncompliance, dated February 27, 2018 [Doc. 140-1], and (2) Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act* ("Joint Statement") [Doc. 140-7]. The Carland Defendants contend the documents constitute hearsay.

*First*, the Letter of Findings of Noncompliance, dated February 27, 2018, is inadmissible hearsay. Plaintiffs fail to provide any foundational facts to demonstrate that the report falls within any hearsay exception, including FED. R. EVID. 803(6) or FED. R. EVID. 803(8). Further, plaintiffs fail to authenticate the document. The documents are not self-authenticating because they contain neither a seal nor a certification. *See* FED. R. EVID. 902(1), (2), (4). Further, plaintiffs produce no evidence directed to any of the methods of authentication included in FED. R. EVID. 901. Thus, the court does not consider the Letter of Findings of Noncompliance for the truth of the matters asserted.

*Second,* the Carland Defendants' hearsay objection to the Joint Statement is misplaced. The Joint Statement constitutes a statement of official government policy, rather than a declarant's written statement. *See Austin v. Town of Farmington*, 826 F.3d 622, 628 n.7 (2d Cir. 2016). Accordingly, the appropriate question is not admissibility, but the persuasive weight to be afforded the statement. *Id.*; *see also Kuhn ex rel. Kuhn v. McNary Estates Homeowners Ass'n, Inc.*, 228 F. Supp. 3d 1142, 1149 (D. Or. 2017).

C.      *Issues with Respect to Plaintiffs Turner, Johnson, and Rand*

In their reply, the Carland Defendants note that Shaw's response brief offers no substantive response on behalf of plaintiffs Turner, Rand, or Johnson and request the court consider the facts contained in the motions against those plaintiffs to be undisputed and grant those motions.

It is well-established in the Tenth Circuit that "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party." *Reed v. Bennett,* 312 F.3d 1190, 1195 (10th Cir. 2002). Rather, "[t]he district court must make the additional determination that judgment for the moving party is 'appropriate' under Rule 56." *Id.* "Summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Id.* And, as previously noted, the court approved the plaintiffs' request to consider plaintiff Shaw's response to be responsive to the motions against plaintiffs Rand, Turner, and Johnson. *See* [Doc. 144].

Thus, the court reviews the Carland Defendants' submissions with respect to plaintiffs Turner, Johnson, and Rand to determine if, taking as true all *material* facts asserted and *properly supported* in the motion for summary judgment, the Carland Defendants are entitled to judgment as a matter of law. *Reed*, 312 F.3d at 1195.

## III.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, "[t]he evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party." *Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir. 2004).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson,* 477 U.S. at 249).  Summary judgment is appropriate only "where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Stover,* 382 F.3d at 1070 (quoting FED. R. CIV. P. 56(c)).

## IV.    Undisputed Material Facts

The following material facts are undisputed for purposes of the Carland Defendants' motions for summary judgment:[5]

Plaintiff Della Shaw is an eighty-five-year-old woman with disabilities that require her to rely on a cane to ambulate and for balance.  [Doc. 92, p. 9, ¶ 1; Doc. 140, pp. 7-14].  Plaintiff Bertha Johnson is a sixty-eight-year-old woman with disabilities. [Doc. 104, p. 10, ¶ 1; Doc. 140, pp. 7-14].  Plaintiff Sherlyne Turner is a seventy-year-old woman with disabilities that require her to rely on a walker to ambulate and for balance.  [Doc. 103, p. 10, ¶ 1; Doc. 140, pp. 7-14].  Plaintiff Mary Rand is a sixty-eight-year-old woman with disabilities that require her to rely on a cane to ambulate and for balance.  [Doc. 97, p. 9, ¶ 1; Doc. 140, pp. 7-14].

Each of the four plaintiffs executed lease agreements with Cherokee Meadows Apartments for units at the Community:  Shaw for Unit B1 on December 16, 2016 [Doc. 92, p. 9, ¶ 2; Doc. 140, p. 7, ¶ 1; Doc. 92-1]; Johnson for Unit B4 on January 5, 2017 [Doc. 104, p. 10, ¶ 2; Doc. 140, pp. 7-14; Doc. 104-1]; Turner for Unit J4 on January 20, 2017 [Doc. 103, p. 10, ¶ 2; Doc. 140, pp. 7-14; Doc. 103-1]; and Rand for Unit M1 on January 20, 2017 [Doc. 97, p. 9, ¶ 2; Doc. 140, pp. 7-14; Doc. 97-1].   Plaintiffs moved into their respective units in Cherokee Meadows before construction was complete.  [Doc. 92, p. 9, ¶ 2; Doc. 104, p. 10, ¶ 2; Doc. 103, p. 10, ¶ 2; Doc. 97, p. 9, ¶ 2; Doc. 140, pp. 7-14].  Neither Shaw nor Rand requested to see another unit before either

---

[5] In the reply brief, the Carland Defendants object to plaintiffs' response as violating LCvR 56.1, and note that plaintiffs failed to file a version of their response brief with exhibits until after the court's response deadline.  [Doc. 147, p. 9].  Plaintiffs filed the original response and objection without exhibits at 11:57 p.m. on August 15, 2019—the court's response deadline.  [Doc. 139].  As 1:35 a.m. on August 16, 2019, plaintiffs filed the amended response brief that included the exhibits.  [Doc. 140].  The court declines to deem the Carland Defendants' asserted statements of material fact undisputed based solely on a delay of one hour and thirty-five minutes.

signed her respective residential lease. [Doc. 92, p. 12, ¶ 24; Doc. 97, p. 13, ¶ 27; Doc. 140, pp. 7-14].

Effective January 1, 2017, Cherokee Meadows, LP "and its successors and Transferees" and the Oklahoma Housing Finance Agency executed the Regulatory Agreement for Low-Income Housing Tax Credits Creating Restrictive Covenants. [Doc. 105-1]. Turner was initially denied a unit in the Community because she would not provide the property manager necessary paperwork related to her housing voucher, but, since then, no one at Carland Properties or Cherokee Meadows has refused to accept her housing voucher as part of her rent. [Doc. 103-2, pp. 110:11 to 112:1, 113:9-14]. Plaintiffs have renewed their respective leases and remain residents of the Community. [Doc. 92, p. 9, ¶ 3; Doc. 104, p. 10, ¶ 3; Doc. 103, p. 10, ¶ 3; Doc. 97, p. 9, ¶ 3; Doc. 140, pp. 7-14].

Shaw completed a Move In Inspection Report, which stated "[t]he premises are being delivered in clean, sanitary, and good operating condition, with no spots, stains, marks or damages, unless otherwise noted below in the "Move-In Exceptions' box." [Doc. 140-9]. The Inspection Report did not note any issues regarding cabinet heights, toilet clearances, light switch heights, or threshold heights. [Doc. 92, p. 13, ¶ 28; Doc. 140, p. 11, ¶ 17; Doc. 140-9].

On January 20, 2017, Shaw and Rand issued a handwritten letter to "Terry D. Carty, owner and or the current project manager for Cherokee Meadows" "requesting reasonable accommodations," including that "all driveways have proper inlets and ADA safety." [Doc. 92, p. 11, ¶ 15; Doc. 140, pp. 7-14; Doc. 92-8]. The letter stated:

> The Cherokee Meadows' driveways, with mountable steep curbs, while we are told passed inspection, are a safety issue. We are endangered as there are no inlets and access is difficult or impossible. We are afraid of falling on the driveway curbs. None of the residents have safe access for us to simply cross the street and visit neighbors.

[Doc. 92-8; Doc. 140-2]. The letter also noted that the Community did not have mail delivery or landlines. [*Id.*]. Carty responded in a letter dated January 25, 2017. [Doc. 92, p. 11, ¶ 16; Doc. 140, pp. 7-14; Doc. 92-9]. Carty suggested that tenants in need of a landline for a heart monitor contact AT&T's local office for a temporary accommodation until permanent lines were installed, and suggested possible solutions with respect to getting mail from the curb-situated mailboxes. Specifically, Carty suggested that "if any tenant thinks the curbs might be an issue we will replace their mailbox with one that opens from both sides," and also that postal customers may request special accommodations from the United States Postal Service and have their mail delivered to their door with a letter from their doctor. The letter states that Cherokee Meadows "would gladly provide a mail box at the door." [92-9, p. 1]. AT&T installed a temporary phone line within two weeks of Rand moving into her unit, and Rand had no problems with the line once installed. [Doc. 97, p. 12, ¶ 21; Doc. 140, pp. 7-14; Doc. 97-2, p. 34:13 to 35:1].

In early March 2017, Johnson claims that she fell off of a curb at Cherokee Meadows. [Doc. 104, pp. 10, ¶ 4; Doc. 104-2, pp. 9:25 to 11:17; 22:3-12]. Johnson stated that it was "pitch black dark" at the time of her fall because there were no lights on the property. [Doc. 104, p. 11, ¶ 5; Doc. 104-2, p. 8:18-25]. Turner also claims that she fell at night when she was stepping down from a curb onto the street with her walker. [Doc. 103, p. 11, ¶ 4; Doc. 103-2, p. 14:18 to 16:16]. Neither Shaw nor Rand have fallen because of the curbs. [Doc. 92, p. 9, ¶ 4; Doc. 97, p. 9, ¶ 4; Doc. 140, pp. 7-14]. In early 2017, Cherokee Meadows estimated the costs to change the mountable curbs would exceed $100,000.00. [Doc. 92, p. 10, ¶ 8; Doc. 140, pp. 7-14; Doc. 92-4, p. 4, ¶ 17].

In the spring of 2018, Carland Properties was advised by Tax Credit Assurance that allowing tenants to pay rent late, without imposing late fees, was having a negative financial

impact upon Cherokee Meadows monthly financial reports. Tax Credit Assurance prepared and recommended a payment plan system that would eventually bring tenants who consistently paid rent late on schedule. This change in policy included the imposition of late fees for late rent payments as well as payment of an additional agreed fee that would eventually allow these tenants to pay their rent on time. The payment plan and imposition of late fees was applied universally to all late-paying tenants at Cherokee Meadows, not just the tenants involved in this litigation. [Doc. 97, pp. 14-15, ¶¶ 41-42; Doc. 104, p. 13, ¶¶ 23-24; Doc. 97-10, pp. 2-3, ¶¶ 7-11, 14]. Rand paid a late fee for three months, but, after she complained, the Carland Defendants ceased its application of the new policy to her and refunded all late fees it had charged her. [Doc. 97, p. 14, ¶ 40; Doc. 140, pp. 7-14; Doc. 97-10, pp. 3-4, ¶ 15; Doc. 97-2, p. 79:2-7]. Johnson refused to accept the policy change and continued paying her rent as she had since moving into Cherokee Meadows. [Doc. 104, p. 13, ¶ 25; Doc. 140, pp. 7-14; Doc 104-2, pp. 39:16 to 40:3]. Cherokee Meadows never pursued late fees against Johnson. [Doc. 104, p. 13, ¶ 25; Doc. 140, pp. 7-14; Doc. 104-8, p. 4, ¶ 16].

In October 2018, Turner alleges that Collette Anderson, the then-property manager, "told her that her lease was up before it really was." [Doc. 103, p. 14, ¶ 31; Doc. 103-2, p. 102:4-21]. However, Turner corrected Anderson, and did not sign a renewal lease at that time. [Doc. 103, p. 14, ¶ 31; Doc. 103-2 at pp. 102:22 to 103:1].

At some point during Johnson's residency at the Community, the then-property manger Kelly informed Johnson of a $10 rent shortage for each month of her residence there. [Doc. 104, p. 12, ¶ 19; Doc. 140, pp. 7-14; Doc. 104-2, pp. 35:8 to 37:10]. Johnson requested that Kelly call Carland and the corporate office said that it was a "misunderstanding" and that Johnson did not

owe anything. [*Id.*]. Johnson never paid the alleged $10 per month shortage. [Doc. 104, p. 13, ¶ 20; Doc. 140, pp. 7-14; Doc. 104-2, pp. 35:8 to 37:10].

In November and December 2018, Cherokee Meadows, LP retrofitted the mountable curbs by removing them across the driveways to each apartment and replacing them with a sloping driveway. [Doc. 92, p. 10, ¶ 11; Doc. 140, pp. 7-14; Doc. 92-4, p. 4, ¶ 20]. As of July 1, 2019, the cost to retrofit the curbs was $36,500.00. [Doc. 92, p. 11, ¶ 12; Doc. 140, pp. 7-14; Doc. 92-4, p. 5, ¶ 21]. As of July 1, 2019, Shaw, Rand, and Turner have mail delivered directly to their respective doors. [Doc. 92, p. 12, ¶ 21; Doc. 97, p. 10, ¶ 6; Doc. 103, p. 14, ¶ 25; Doc. 92, pp. 7-14].

## V.     Carland Defendants Analysis

As previously stated, the Carland Defendants seek partial summary judgment separately against each plaintiff as to Count 1, violation of § 3604(f)(3)(C) of the Fair Housing Act; Count 2, discrimination under the Fair Housing Act; and Count 3, violation of § 504 of the Rehabilitation Act. The Carland Defendants raise the following propositions in their motions for partial summary judgment against all plaintiffs: (i) plaintiffs cannot establish that the Carland Defendants engaged in discriminatory conduct under the FHA; (ii) plaintiffs cannot establish a *prima facie* case of failure to make a reasonable accommodation under the FHA; (iii) plaintiffs cannot establish retaliation under the FHA; (iv) plaintiffs are not entitled to punitive damages under the FHA; (v) plaintiffs are not entitled to emotional distress damages under the FHA; (vi) plaintiffs cannot establish a *prima facie* case of discrimination under the Rehabilitation Act; and (vii) plaintiffs' request for injunctive relief is moot. Additionally, as to plaintiffs Johnson and Turner, the Carland Defendants contend that those plaintiffs cannot establish a breach of the duty by the Carland Defendants under the FHA resulting in personal injury.

The court first considers the propositions related to the Fair Housing Act.

*A.     Fair Housing Act*

Section 3604(f) of the Fair Housing Act ("FHA") generally prohibits discrimination in the sale or rental of any dwelling because of handicap. The Tenth Circuit has recognized that "[p]rohibited handicap discrimination may take several forms, including (1) disparate treatment, i.e., intentional discrimination; (2) disparate impact, i.e., the discriminatory effect of a facially neutral practice or policy; (3) a refusal to permit 'reasonable modifications of existing premises'; (4) a 'refusal to make reasonable accommodations in rules, policies, practices, or services'; or (5) a failure to 'design and construct' handicap accessible buildings." *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1272-73 (10th Cir. 2001) (quoting 42 U.S.C. § 3604(f)(3)). Additionally, the FHA prohibits "steering" and retaliation. 42 U.S.C. 3605(a), (f)(1) and 42 U.S.C. § 3617, respectively.

In Count 1, plaintiffs assert a discrimination claim for failure to "design and construct" handicap accessible multifamily dwellings pursuant to 42 U.S.C. § 3604(f)(3). In Count 2, plaintiffs seek recovery for violation of § 3604(f), which prohibits discrimination "in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Count 2 also expressly sets forth a "steering" theory of recovery. The Carland Defendants seek summary judgment as to each of these theories of recovery.

Additionally, apparently based on the sections of the Complaint entitled "Introduction" and "Additional Relevant Facts," *see, e.g.,* [Doc. 2, ¶¶ 16-19, 100-101], as well as plaintiffs' discovery responses, the Carland Defendants seek summary judgment as to the following theories of recovery: intentional discrimination in the form of refusal to rent or inspect in violation of §

3604(d), (f)(1); denial of reasonable accommodation pursuant to § 3604(f)(3)(B); and retaliation under § 3617. The court has thoroughly reviewed Count 2 and the Complaint does not explicitly set forth those theories. However, the court is mindful of the Tenth Circuit's admonition that

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

*Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219 at 194 (1990)). This is particularly true when the new theories serve only to support another way of proving an existing claim. *Torres v. Cintas Corp.*, 672 F. Supp. 2d 1197, 1206 (N.D. Okla. 2009). Here, the Carland Defendants have briefed the additional theories in their motions for summary judgment and address those theories as having been raised in this case. Further, the Carland Defendants do not contend that consideration of these additional theories will prejudice them. The court notes that the denial of reasonable accommodation in violation of § 3604(f)(1) and retaliation in violation of § 3617 are alternative theories of discrimination in violation of the FHA. Moreover, a denial of reasonable accommodation constitutes "discrimination" for purposes of subsection 3604(f). 42 U.S.C. § 3604(f)(3)(B). The court will therefore consider the additional theories not explicitly set forth in Count 2.

1. <u>Failure to Design and Construct (Count 1 – Violation of § 3604(f)(3)(C))</u>

Plaintiffs first assert that the Carland Defendants failed to design and construct the Community dwellings in such a manner that the public use and common use portions were readily accessible to, and usable by, handicapped persons in violation of § 3604(f)(3)(C). Specifically,

plaintiffs assert that the Community's tall curbs and walking path, as well as the toilets and showers installed in the UFAS units,[6] are not accessible by persons with handicaps in violation of the FHA.

Section 3604(f) of the Fair Housing Act ("FHA") defines "discrimination" to include:

in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after [September 13, 1988], a failure to design and construct those dwellings in such a manner that—

    (i)    the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

    (ii)    all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

    (iii)    all premises within such dwellings contain the following features of adaptive design:

        (I)    an accessible route into and through the dwelling;

        (II)    light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

        (III)    reinforcements in bathroom walls to allow later installation of grab bars; and

        (IV)    usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

42 U.S.C. § 3604(f)(3)(C). "Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1') suffices to satisfy the requirements of paragraph (3)(C)(iii)." 42 U.S.C. § 3604(f)(4). Further, a designer or builder may comply with

---

[6] Plaintiffs Shaw and Rand occupy UFAS units. Plaintiffs Turner and Johnson do not.

the FHA's requirements through compliance with accessibility standards incorporated into law by a state or local government.  42 U.S.C. § 3604(f)(5)(A).[7]

The Carland Defendants, as the movants, bear the initial responsibility to demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Movants such as the Carland Defendants, "who do[] not bear the burden of persuasion at trial may satisfy this burden 'by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim.'"  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)); *see also* FED. R. CIV. P. 56(c)(1)(B) (requiring a "*showing* . . . that an adverse party cannot produce admissible evidence to support the fact").  However, a movant contending that a nonmovant lacks essential evidence must present more than conclusory assertions, and "because the rule explicitly requires a 'showing,' there must be at least enough evidentiary support for the assertion that the nonmovant lacks crucial evidence to demonstrate the movant's good faith."  11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.40[1][b] (3d ed. 2019) (internal footnote omitted).

Here, the Carland Defendants submit no admissible evidence that the Community's curbs or walking path comply with the applicable design and construction requirements.[8]  Rather, the summary judgment record includes evidence that the curbs and walking path were inaccessible to

---

[7] It has not been established that the City of Tulsa incorporated the FHA's requirements into its building codes and ordinances.

[8] As previously stated, the Executive Director's Report of the May 2017 TDA Board of Commissioner's Meeting, the March 28, 2017 letter from Crafton Tull, the April 28, 2017 letter from Blackledge, or the January 23, 2017 letter from the Oklahoma Housing Finance Agency constitute inadmissible hearsay and the court may not consider them for the truth of the matters asserted.

plaintiffs due to height.  [Doc. 97-2, p. 14:5-12; Doc. 92-2, pp. 23:24 to 24:11; Doc. 104-2, pp. 9:25 to 11:17; 22:3-12; Doc. 103-2, p. 14:18 to 16:16].  Nor do the Carland Defendants present evidence that the toilets or showers in the UFAS individual units were useable such that an individual in a wheelchair could maneuver the space.  Although the Carland Defendants present evidence that Shaw did not note any issues with respect to the toilet or showers, Shaw's knowledge of any potential defects is not determinative of the Carland Defendant's compliance with the applicable requirements.  Finally, and most significantly to the court, the Carland Defendants' motion, although requesting summary judgment as to Count 1, includes no argument directed specifically to § 3604(f)(3)(C) or the design and construction of the Community and the individual units therein so as to be readily accessible and useable by handicapped persons.   Under the circumstances, the court concludes that the Carland Defendants failed to meet their initial burden to demonstrate that no genuine dispute of material fact exists as to plaintiffs' § 3604(f)(3)(C) claim. Thus, summary judgment is inappropriate as to plaintiffs' Count 1.  Further, in light of the dearth of admissible evidence in the summary judgment record regarding FHA compliance, "the better course would be to proceed to a full trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citing *Kennedy v. Silas Mason Co.,* 334 U.S. 249 (1948)).   The Carland Defendants' motion for summary judgment with respect to Count 1, violation of 42 U.S.C. § 3604(f)(3)(C), is denied.

2.     Disparate Treatment – Intentional Discrimination (§ 3604(d), (f)(1), (2))

The Carland Defendants next contend that plaintiffs cannot establish a *prima facie* case of intentional discrimination under the FHA.

Plaintiffs may prove intentional discrimination (disparate treatment) in two ways.  First, plaintiffs may present direct evidence of discrimination.   Second, plaintiffs may submit

circumstantial evidence and rely on the *McDonnell Douglas* burden-shifting framework. *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012); *see also id.* (characterizing the *McDonnell Douglas* framework as "originally spawned in the Title VII arena but long since equally entrenched in the FHA, ADA, and RA contexts"). Plaintiffs assert that they submit direct evidence of discrimination—specifically, Shaw's deposition testimony that she did not specifically request Unit B1, a handicap (UFAS) unit, and that she did not have an opportunity to inspect her unit prior to moving in. *See* [Doc. 140, pp. 17 (citing Doc. 92-2, pp. 123:19, 126:8-12, 129:24 to 130:6, 131:8-2)].[9]

"Direct evidence of discrimination is evidence which, if believed, proves that the decision in the case at hand was discriminatory—and does so without depending on any further inference or presumption." *Id.* (citing *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir. 1999)). The court disagrees that Shaw's deposition testimony constitutes direct evidence of discrimination. Shaw did not testify that anyone associated with the Carland Defendants made discriminatory comments regarding handicapped persons at the time she applied for her unit, nor that any discriminatory policy wholly prohibited persons with handicaps from inspecting units. *Cf. id.* at 920. Rather, for Shaw's deposition testimony to have any evidentiary value the court must rely on the inference that Shaw was assigned Unit B1 and not permitted to inspect any unit prior to moving in *because of* her handicap. Thus, the court turns to the *McDonnell Douglas* burden-shifting framework.

---

[9] Plaintiffs point to no other direct evidence of discrimination with respect to this claim. In determining a motion for summary judgment, "[i]t is not this court's task to comb through Plaintiffs['] submissions in an effort to link alleged facts to . . . arguments or to construct Plaintiffs['] arguments for [them]." *Boldridge v. Tyson Foods, Inc.,* No. 05-4055-SAC, 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) (quoting *Barcikowski v. Sun Microsystems, Inc.*, 420 F. Supp. 2d 1163, 1179 (D. Colo. 2006)).

Pursuant to the *McDonnell Douglas* analysis, "plaintiff first must come forward with proof of a prima facie case of discrimination." *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989). If the plaintiff establishes a prima facie case, the burden shifts to defendants to produce evidence that the alleged discriminatory conduct was motivated by legitimate, non-discriminatory considerations. *Id.* "[O]nce defendants by evidence articulate non-discriminatory reasons, the burden shifts back to plaintiff to show that the proffered reasons were pretextual." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

In order to establish a *prima facie* case of discrimination based on handicap under the FHA, plaintiffs must prove that: (1) they are handicapped; (2) that they applied for and were qualified to rent a unit in the Community; (3) they were denied the opportunity to rent or inspect a unit; and (4) the housing opportunity remained available. *Id.* at 1280; *see also Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 375 (E.D.N.Y. 2008).

Plaintiffs assert that the Carland Defendants refused to rent them a non-Uniform Federal Accessibility Standard unit and, further, did not permit them the opportunity to inspect any other units prior to moving in. [Doc. 140, p. 17]. Thus, plaintiffs premise their claims on the Carland Defendants' alleged refusal to permit them to rent or inspect non-handicap accessible units in the Community. The court construes these claims as being asserted pursuant to § 3604(d) and (f)(1).

Plaintiffs' intentional discrimination claim premised on failure to permit plaintiffs to rent or inspect non-handicap accessible units fails. First, with respect to Johnson and Turner, the record is devoid of any evidence that those plaintiffs received a handicap (UFAS) accessible unit. Second, as to all plaintiffs, including Shaw and Rand, plaintiffs submit no evidence that non-handicap accessible units were available at the time. In their response, plaintiffs assert "[t]his Court *should* accept as a fact that other non-handicap accessible units were available for rent at the time and

after the time that the Defendants assigned Plaintiff Shaw to the handicap accessible unit." [Doc. 140, p. 17 (emphasis added)]. However, plaintiffs offer no evidence to warrant the court accepting the availability of non-handicap accessible units as fact. It is well established that "argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009). *See also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."). Further, the court notes that both Shaw and Rand testified that they did not request to view or inspect any other unit after construction of the Community was complete. *See* [Doc. 92-2, p. 130:17-24; Doc. 97-2, pp. 49:1-13, 72:14-19]. Thus, the Carland Defendants are entitled to summary judgment for this additional reason. *See Smith v. Mission Assocs. Ltd. P'ship*, 225 F. Supp. 2d 1293, 1301 (D. Kan. 2002).

The Carland Defendants' motions raise additional issues with respect to Turner and Rand. The Carland Defendants contend that Turner cannot establish that she was initially denied a unit at the Community for a discriminatory reason.[10] Defendants present undisputed evidence that Turner was initially denied a unit in the Community because she would not provide the property manager paperwork related to her housing voucher but that, since then, defendants have never refused to accept her housing voucher as part of her rent. [Doc. 103-2, pp. 110:11 to 112:8; 113:9-14]. Thus, the Carland Defendants produce evidence that the initial refusal to rent a unit to Turner was motivated by a legitimate, non-discriminatory reason. Plaintiffs submit no evidence to show that the proffered reason was pretextual. Thus, the Carland Defendants are entitled to summary

---

[10] The court also construes these theories as being premised on an alleged violation of § 3604(f)(1).

judgment on Turner's discrimination claim to the extent premised on the Carland Defendants' initial refusal to rent to her.

With respect to Rand, the Carland Defendants contend that Rand cannot show that the change in the rent late-fee policy was discriminatory.[11]  It is undisputed that, in early 2018, the Carland Defendants instituted a new policy that included the imposition of late fees for late rent payments as well as payment of an additional agreed fee that would eventually allow these tenants to pay their rent on time.  The Carland Defendants present undisputed evidence that the policy change applied universally to all late-paying tenants and was intended to bring tenants who consistently paid rent late on schedule.  [Doc. 97, pp. 14-15, ¶¶ 41-42; Doc. 104, p. 13, ¶ 23; Doc. 97-10, p. 3, ¶¶ 8-10, 14].  Thus, defendants present evidence of a legitimate, non-discriminatory reason for the change in policy.  Plaintiffs produce no evidence from which the court may reasonably infer that the defendants' proffered reason is pretextual.[12]  Thus, the Carland Defendants are entitled to summary judgment.

3.     Steering (Count 2 Theory, § 3604(a), (f)(1))

The Carland Defendants next contend that they are entitled to summary judgment as to plaintiffs' steering theory of recovery.

"Steering is not an outright refusal to rent to a person within a class of people protected by the statute; rather it consists of efforts to deprive a protected homeseeker of housing opportunities in certain locations."  *HUD ex rel. King v. Edelstein*, No. HUDALJ 05-90-0821-1, 1991 WL

---

[11] To the extent premised on a change in the late-fee policy, the court construes the theory as asserting a violation of § 3604(f)(2), for discrimination in the "terms, conditions, or privileges" of rental of the dwelling.

[12] The court considers temporal proximity with respect to plaintiffs' retaliation theory of recovery, discussed in § 5, below.

442784, at *5, *5 n.8 (HUD Dec. 9, 1991). The claim falls within the "otherwise make unavailable" language of the statute. 42 U.S.C. § 3604(a), (f)(1). Implementing regulations promulgated by the Department of Housing and Urban Development make it unlawful "to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a). Prohibited actions include "[a]ssigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of . . . handicap . . . ." 24 C.F.R. § 100.70(c)(4). A "steering" claim is subject to the same analysis as an intentional discrimination claim and therefore requires proof of discriminatory intent. *Mont. Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 840 (D. Mont. 2012) ("[Requiring a showing of discriminatory intent] is supported by the language of 24 C.F.R. § 100.70, which prohibits restricting, discouraging, or obstructing 'because of . . . handicap.' The language implies that the discriminatory action must be the product of a discriminatory mental state and not due to some non-invidious reason."); *Head v. Cornerstone Residential Mgmt., Inc.,* No. 05-80280-CIV-MARRA, 2012 WL 12843224, at *6 (S.D. Fla. Mar. 27, 2012).

Plaintiffs allege that Rand and Shaw were steered toward UFAS units. [Doc. 2, p. 25, ¶¶ 142-143]. Thus, as an initial matter, the court notes that the "steering" theory appears to be limited to those two plaintiffs.[13] With respect to Rand and Shaw, because the same analysis applies to the steering claim as plaintiffs' intentional discrimination claim, plaintiffs' steering claim fails for the reasons discussed above in § 2. Plaintiffs fail to create a genuine dispute of material fact as to denial of a non-handicap accessible unit, as well as the availability of non-handicap accessible units. Further, plaintiffs offer no evidence from which the court may reasonably infer

---

[13] Further, as set forth above, the summary judgment record includes no evidence that either Turner or Johnson received a handicap accessible unit.

discriminatory intent in assignment of the units. For these reasons, the Carland Defendants' are entitled to summary judgment as to plaintiffs' steering claim.

4.     Denial of Reasonable Accommodations (42 U.S.C. § 3604(f)(3)(B)

To establish discrimination under the FHA for failure to accommodate, plaintiffs must demonstrate: (1) that they are handicapped as defined by the FHA; (2) that defendants knew or reasonably should have known of the claimed handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendants refused to make such accommodation. *Arnal v. Aspen View Condo. Ass'n, Inc*., 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016) (citing *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)). The Defendants do not contend that plaintiffs are not handicapped or that they were unaware of the handicap. Rather, the Carland Defendants challenge plaintiffs' asserted requested accommodations.

The four plaintiffs collectively allege that they made reasonable accommodation requests for remediation of the inaccessible tall curbs and access to their respective mailboxes.[14] Additionally, plaintiff Rand asserts that she requested that the Carland Defendants provide her a permanent landline necessary for her pacemaker and a change in the defendants' rental payment

---

[14] With respect to the curb remediation issue, the court questions whether the claim is more appropriately framed as one for a request for reasonable *modification* pursuant to § 3604(f)(3)(A), rather than one for reasonable *accommodation* pursuant to § 3604(f)(3)(B). *See Weiss v. 2100 Condo. Ass'n, Inc*., 941 F. Supp. 2d 1337, 1346-47 (S.D. Fla. 2013); *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Modification Under the Fair Housing Act*, pp. 6-8 (Mar. 5, 2008). Further, the court notes that, in the Complaint, plaintiffs state that they were denied "requests for modification," [Doc. 2, p. 18, ¶ 101], but, in their response to the motion for summary judgment, cite § 3604(f)(3)(B), which is applicable to requests for reasonable accommodation. [Doc. 140, p. 15]. However, neither party raised the propriety of reasonable "accommodation" versus "modification" in their briefing and therefore the issue is not before the court.

policy to permit her to pay her rent on the third Wednesday of the month, rather than the designated deadline. The court first considers the plaintiffs' collective claim for curb remediation and mailbox access.

The Carland Defendants first assert that plaintiffs failed to request accommodation to remediate the curbs, and cite plaintiffs' discovery responses as conceding the issue. However, plaintiffs submit evidence that they specifically requested remediation of the curbs on several occasions. *See* [Doc. 140-2 (letter signed by plaintiffs Shaw and Rand, stating "[w]e request all driveways have proper inlets and ADA safety. The Cherokee Meadows' driveways, with mountable steep curbs, which we are told passed inspection, are a safety issue"); Doc. 140-3 ("memorandum" signed by plaintiffs Rand, Turner, and Johnson requesting "these hazardous mountable curbs to be torn out and redone with proper driveways and inlets"); Doc. 140-4 (undated letter signed by Rand, Shaw, and Johnson requesting the Carland Defendants "take responsibility and modify the curbs to make it more efficient and safe for all users"); Doc. 140-5 ("Addendum" from Oklahoma State Representative Regina Goodwin on behalf of "senior citizens," and specifically mentioning Shaw, Rand, and Johnson, requesting that the driveway curbs be "immediately" reconstructed)[15]; and Doc. 140-6 (letter dated October 2, 2017, prior to filing of the Complaint, from plaintiffs' attorney Eric Hallett requesting correction of deficiencies including "barrier curbs run[ing] across the front of each driveway")]. Further, with respect to mailbox access, Hallett's letter, as well as a July 25, 2017 Housing Discrimination Complaint filed on

---

[15] The Fair Housing Act does not require the person with the handicap to personally make the request for reasonable accommodation or modification. Instead, the request can be made by someone acting on the handicapped person's behalf. *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Modification Under the Fair Housing Act*, pp. 9-10 (Mar. 5, 2008); *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act*, p. 10 (May 17, 2004).

behalf of Shaw, request mailbox access.  [Doc. 140-6; Doc. 140-8].  Thus, a genuine dispute of material fact exists.

The Carland Defendants next contend that the requested accommodations were neither necessary nor reasonable.  The Tenth Circuit defines "necessary" as implying something more than "merely helpful or conducive," and "suggest[ing] instead something 'indispensable,' 'essential,' something that 'cannot be done without.'"  *Cinnamon Hills Youth Crisis Ctr., Inc.*, 685 F.3d at 923 (quoting OXFORD ENGLISH DICTIONARY, vol. X at 276 (2d ed. 1989)).  The object of the requirement "is a level playing field in housing for the disabled," and therefore "[t]he law requires accommodations overcoming barriers, imposed by disability, that prevent the disabled from obtaining a housing opportunity others can access."  *Id.*  However, the law does not require "*more* or *better* opportunities."  *Id.* (emphasis in original); *see also* 42 U.S.C. § 3604(f)(3)(B) (emphasis added) ("[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, *when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling*.").  Viewing the evidence in the light most favorable to the non-movant plaintiffs, a genuine dispute of material fact exists as to whether the requested remediation of the curb and mailbox accessibility was necessary to afford plaintiffs an equal opportunity to use and enjoy the Community.  *See* [Doc. 92-2, pp. 21:16 to 26:4; 54:4 to 55:19; Doc. 140-2 ("We are elderly and have physical limitations and handicaps.  We are assisted with wheelchairs, walkers and heart monitors. . . .  We are endangered as there are no inlets and access is difficult or impossible.  We are afraid of falling on the driveway curbs."); Doc. 140-4 (noting that the curbs were a hazard for those in wheelchairs, etc.); Doc. 140-8, p. 4].

With respect to reasonableness, "[t]o determine the reasonableness of the requested modification, the burden that the requested modification would impose on the defendant (and

perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff." *Anderson v. City of Blue Ash*, 798 F.3d 338, 362 (6th Cir. 2015) (citing *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 542 (6th Cir. 2014)). "This is a highly fact-specific inquiry." *Id.*; *see also Haws v. Norman*, No. 15-CV-00422-EJF, 2017 WL 4221064, at *7 (D. Utah Sept. 20, 2017). The Carland Defendants present undisputed evidence that, in early 2017, upon receiving complaints from plaintiffs, the defendants undertook efforts to investigate remediation of the mountable curbs, and estimated that it could cost as much as $100,000.00 to change. [Doc. 92, p. 10, ¶ 8; Doc. 140, pp. 7-14; Doc. 92-4, p. 4, ¶ 17]. As previously noted, it is undisputed that the actual cost to retrofit the curbs was $36,500.00. However, the economic burden imposed on the Carland Defendants must be weighed against the benefits accrued to the plaintiffs through curb remediation. As discussed above, plaintiffs submit evidence that the remediation was necessary to permit plaintiffs an equal opportunity to use and enjoy the Community and, specifically, to alleviate plaintiffs' concerns for their personal safety. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 272-73 (4th Cir. 2013) (recognizing that "the potential for personal injury is a relevant consideration in examining whether a modification or accommodation request was reasonable"). Thus, a genuine dispute of material fact exists as to the reasonableness of plaintiffs' request and summary judgment is inappropriate on this basis.

Finally, the Carland Defendants argue that they did not deny plaintiffs' requests for reasonable accommodation. The Carland Defendants point to undisputed evidence that, in November and December of 2018, Cherokee Meadows LP retrofitted the mountable curbs by removing them across the driveways to each apartment and replacing them with a sloping driveway. Further, the Carland Defendants point to evidence that Shaw, Rand, and Turner

currently receive their mail at their respective front doors.  However, it is also undisputed that Cherokee Meadows, LP did not finish retrofitting the curbs until December of 2018—nearly two years after plaintiffs' first complaint.  Additionally, the summary judgment record includes evidence that plaintiff Turner did not begin receiving mail to her front door until after October 6, 2017 [Doc. 103-9], and plaintiff Shaw did not begin receiving mail to a front porch mailbox until sometime after July 7, 2017 [Doc. 92-10].  Apart from timing, viewing the evidence in the light most favorable to plaintiffs, a dispute exists as to whether the Carland Defendants or plaintiffs themselves arranged for the installation of, and therefore access to, their mailboxes.  *See, e.g.,* [Doc. 92-2, pp. 173:11 to 175:23].

Under the FHA, an unreasonable delay may constitute a constructive denial.  *See Scoggins*, 718 F.3d at 271-72 (delay of 15 months may be constructive denial); *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000); *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1286 (11th Cir. 2014); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 257 (S.D.N.Y. 2014) (collecting cases).  Thus, a reasonable finder of fact could conclude that the Carland Defendants constructively denied plaintiffs' requests and therefore a genuine dispute of material fact exists.  The Carland Defendants' motion for summary judgment as to plaintiffs' claims for reasonable accommodation in the form of curb remediation and mailbox access is denied.

In addition, the Carland Defendants are entitled to summary judgment on Rand's individual theories that she was denied reasonable accommodations in the form of waiver of late fees and provision of a permanent landline.  Plaintiff Rand contends that, when she first moved into the Community, she was permitted to pay her rent when she received her disability check, rather than at the first of the month deadline, but that, in April of 2018, the Carland Defendants began to impose an $85.00 late-payment penalty on her because she was unable to pay rent at the beginning

of the month. However, the Carland Defendants produce undisputed evidence that, approximately two or three months later and after Rand complained of the new policy, the defendants ceased its application of the policy to Rand and refunded all late fees that had been charged. [Doc. 97, p. 14, ¶ 40; Doc. 140, pp. 7-14; Doc. 97-10, pp. 3-4, ¶ 15; Doc. 97-2, p. 79:2-7].

As for the permanent landline, the Carland Defendants present undisputed evidence that AT&T installed a temporary landline within two weeks of Rand moving into her unit and that she had no problems with that line. [Doc. 97, p. 12, ¶ 21; Doc. 140, pp. 7-14; Doc. 97-2, p. 34:13 to 35:1; Doc. 97-4, p. 5, ¶ 24]. Two weeks is not an "undue delay." *See Moody v. Gongloff*, 687 F. App'x 496, 499 (6th Cir. 2017) (eighty-seven days not unreasonable); *Taylor v. Hous. Auth. of New Haven*, 267 F.R.D. 36, 70 (D. Conn. 2010) (two month delay not unreasonable); *Elliott v. QF Circa 37, LLC,* No. 16-CV-0288-BAS-AGS, 2018 WL 2933467, at *11 (S.D. Cal. June 12, 2018) (one month delay not unreasonable). Further, although Rand asserts that she requested a permanent landline, plaintiff Rand offers no evidence that the temporary landline was insufficient. Although a defendant must make "reasonable accommodations," "it does not have to provide a disabled individual with every accommodation [she] requests or the accommodation of [her] choice." *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012).

The undisputed evidence demonstrates that the Carland Defendants did not deny plaintiff Rand's request for accommodation regarding the landlines and late payments, and no genuine dispute of material fact exists as to plaintiff Rand's individual reasonable accommodation theories. The Carland Defendants are therefore entitled to summary judgment as to Rand's reasonable accommodation claim.

5.    Retaliation (42 U.S.C. § 3617)

The Carland Defendants argue that plaintiffs cannot establish retaliation under the FHA as a matter of law.  Finally, plaintiffs assert a FHA retaliation theory of recovery.  Under the FHA,

> [i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.  To establish retaliation under the FHA, plaintiffs must demonstrate the following: "(1) [she] was engaged in protected activity; (2) [she] suffered an adverse action in the form of coercion, intimidation, threats, or interference; and (3) there was a causal link between the two."  *Arnal*, 226 F Supp. 3d at 1187-88 (citing *Zhu v. Countrywide Realty, Co.*, 165 F. Supp. 2d 1181, 1196 (D. Kan. 2001)); *Morgan v. Carrington Mortg. Servs.*, 719 F. App'x 735, 743 (10th Cir. 2017) (a plaintiff must allege a causal connection between her disability or protected activity and the alleged adverse action).  The Carland Defendants do not dispute that plaintiffs engaged in protected activity.  Thus, the court considers only the second and third requirements.

With respect to the second requirement, in the context of § 3617 FHA retaliation, the adverse action must take the form of "coercion, intimidation, threats, or interference."  *Id.*; *see also Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).  The court finds the Ninth Circuit's definition of these terms helpful.

> "Interference" is "the act of meddling in or hampering an activity or process." *Webster's Third New Int'l Dict.* 1178 (14th ed. 1961).  To "coerce" is "to compel to an act or choice by force, threat, **or other pressure**."  *Id.* at 439.  And, more relevant for this case, "coercion" includes "the application of sanctions or force by a government [usually] accompanied by the suppression of constitutional liberties in order to compel dissenters to conform."  *Id.*  Finally, a "threat" is "an expression to inflict evil, injury, **or other damage** on another."  *Id.* at 2382.

*Walker*, 272 F.3d at 1129 (emphasis in original). The third requirement requires a causal connection between the protected activity and adverse action and therefore also addresses the defendant's intent. *Haws*, 2017 WL 4221064, at *9; *see also Arnal*, 226 F. Supp. 3d at 1188 (citing *Zhu*, 165 F. Supp. 2d at 1196) ("A violation of Section 3617 may be shown even absent other violations of the FHA.").

The court separately considers each plaintiff. Shaw submits evidence that she complained about the curbs to the Carland Defendants in early 2017, including through submission of a January 20, 2017 letter. *See, e.g.,* [Doc. 140-8]. Plaintiff Shaw also submits evidence that, on May 8, 2017, "Residents of Cherokee Meadows" sent a "Memorandum" to the Carland Defendants requesting that the mountable curbs be torn out and redone with proper driveways and inlets. [Doc. 140-3]. Three days, later, Shaw presents evidence that the Cherokee Meadows then-property manager asked Shaw to sign a paper that included a provision stating that if "there was a conflict in the apartment, even if I went to court and if I lost – I mean, I won, I would still have to pay court costs," and, when Shaw's granddaughter stated she should refuse to sign, the property manager asked Shaw's granddaughter to leave and banned her from the office. [Doc. 92-2, pp. 77:7 to 80:13; Doc. 140-10]. Further, Shaw testified that the then-property manager told her that if she didn't like the curbs, she could move and criticized her for complaining. [Doc. 92-2, pp. 90:24 to 92:2]. Taking this evidence together and viewing it in the light most favorable to plaintiff Shaw, a genuine dispute of material fact exists as to whether Shaw suffered an adverse action in the form of interference or intimidation, and that such action was causally related to her protected activity. Thus, a genuine dispute of fact exists and the Carland Defendants' motion for summary judgment with respect to Shaw's retaliation claim is denied.

Next, plaintiff Turner contends that she was subject to adverse action in the form of comments and being told by the then-Cherokee Meadows property manager in October 2018 her lease had expired when, in fact, it had not. With respect to the lease renewal, it is undisputed that Turner corrected the property manager and that Turner did not sign a new lease at that time. [Doc. 103, p. 14, ¶ 31; Doc. 103-2, pp. 102:4 to 103:1]. Turner presents no evidence of a causal connection between her protected activity and the alleged adverse action.[16] Nor does Turner present any evidence that this action coerced, intimidated, threatened, or interfered with her ability to seek a reasonable accommodation. In fact, seeking a renewal of Turner's lease suggests that the Carland Defendants acted to encourage, rather than discourage, a continued relationship with Turner, despite her prior requests. As for the alleged comments, including a suggestion by the Carland Defendants then-property manager that Turner could move if she did not like the curbs, occasional discriminatory comments alone are insufficient to create a genuine dispute of material fact. *See Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1144-45 (S.D. Fla. 2004).

Plaintiff Johnson asserts that she was subject to adverse action because she was accused of consistently being ten dollars ($10) short in her rent payments, as well as imposition of the new late-fee policy in April of 2018. However, defendants present undisputed evidence that, when Johnson objected to the imposition of a monthly back charge of $10, the corporate office immediately stated that Johnson did not owe anything and she never had to pay the $10 per month

---

[16] To the extent that Turner would rely on temporal proximity, the alleged incident occurred a year and a half after Turner first complained about the curbs, a year after plaintiff's counsel sent a letter to the Carland Defendants advising of noncompliance, and almost a year after plaintiffs initiated this lawsuit. A span of one year is not sufficiently proximate to establish causation. *See Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (three months too long a period to establish causal connection); *Fisher v. SP One, Ltd.*, 559 F. App'x 873, 878 (11th Cir. 2014).

shortage. With respect to the imposition of the new late fee policy, the defendants present undisputed evidence that the policy applied to all Community tenants, not just plaintiffs. Moreover, Johnson refused to accept the policy change and it is undisputed that Cherokee Meadows has never pursued late fees against her. Further, Johnson presents no evidence that either policy change was causally related to her protected action.[17] Thus, no genuine dispute of material fact exists.

Finally, Rand asserts she was subject to adverse action through imposition of the new late fee policy. However, as discussed above, it is undisputed that the late fee policy applied to all Community residents, not just plaintiffs, and was designed to bring late paying tenants into compliance. Further, the policy change was not temporally connected to Rand's protected activity. To the extent that Rand asserts she was subject to harassment, she submits no evidence that the harassment was so pervasive so as to rise to the level of coercion, intimidations, threats, or interference. *See Lawrence*, 318 F. Supp. 2d at 1144-45. Again, no genuine dispute of material fact exists.

For the foregoing reasons, the Carland Defendants are entitled to summary judgment as to FHA retaliation asserted by Johnson, Turner, and Rand. However, plaintiff Shaw is entitled to submit her FHA retaliation claim to the jury.

B.    *Fair Housing Act Damages*

The Carland Defendants also seek summary judgment as to certain damages sought by plaintiffs under the Fair Housing Act.

---

[17] Johnson has not produced sufficient evidence of temporal proximity. First, with respect to the $10 per month shortage, Johnson submits no evidence of when the alleged fee was to be charged. Second, it is undisputed that the Carland Defendants imposed the new late fee policy in April of 2018, five months after Johnson initiated this lawsuit and almost a year after her first request for accommodation. *See supra* n. 13.

1.    Punitive Damages

The Carland Defendants contend that plaintiffs are not entitled to punitive damages under the FHA.  Punitive damages are available in a federal civil rights discrimination case when the defendants' actions are shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (quoting *Smith v. Wade*, 461 U.S. 30, 45-48 (1983)).  The "evil motive or intent," or the "reckless or callous indifference," pertain to the defendants' knowledge "that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Id.* at 535.  "The allowance of [punitive] damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent" and "[t]herefore, the infliction of such damages . . . are of necessity within the discretion of the trier of fact."  *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1115 (10th Cir. 2001) (quoting *EEOC v. Gaddis*, 733 F.2d 1373, 1390 (10th Cir. 1984)).

Viewing the evidence in the light most favorable to plaintiffs, a genuine dispute of material fact exists as to whether the Carland Defendants acted in knowing and reckless indifference to the plaintiffs' federally protected rights by unreasonably delaying remediation of the curbs and mailbox access.[18]  *See* [Doc. 140-1; Doc. 140-5; Doc. 140-6; Doc. 140-8].  Further, the propriety of punitive damages involves an evaluation of questions of fact generally inappropriate for resolution on summary judgment.  Thus, the Carland Defendants' motion for summary judgment as to punitive damages is denied.

---

[18]  In fact, in reply, the Carland Defendants recognize "a dispute amongst numerous agencies regarding whether the curbs violated" the ADA.  [Doc. 147, p. 23].

2.    <u>Compensatory Damages</u>

Finally, with respect to the FHA, the Carland Defendants contend that plaintiffs are not entitled to the compensatory damages sought.  First, the Carland Defendants assert that plaintiffs are not entitled to emotional distress damages under the FHA.  Second, the Carland Defendants seek summary judgment as to plaintiffs Johnson and Turner's claims for personal injury.

First, with respect to plaintiffs' claims for emotional distress, the Tenth Circuit has recognized that damages for emotional distress and humiliation may be awarded in FHA litigation. *Steele v. Title Realty Co*., 478 F.2d 380, 384 (10th Cir. 1973) (collecting cases).  "[D]amages from emotional distress may be inferred from circumstances beyond the ordinary" and "[m]edical evidence concerning physical symptoms is not required." *Morgan v. Sec'y of Housing & Urban Development,* 985 F.2d 1451, 1459 (10th Cir. 1993) (citations omitted).  "A causal connection must exist, however, between the illegal action and the complainant's injuries." *Id.*

Viewing the evidence in the light most favorable to the non-movants, a genuine dispute of act exists as to whether Shaw experienced anxiety and distress related to her request for reasonable accommodation of the curbs.  [Doc. 92-2, pp. 90:24 to 92:4].  Although the Carland Defendants characterize Shaw's allegations as a "mild annoyances" that do not justify the imposition of emotional distress damages, defendants' position is not supported by Tenth Circuit law.  The Tenth Circuit has stated, "[e]ven though the discrimination . . . was perpetrated in a courteous manner and was not vindictive or abusive, the right to recover for the humiliation and emotional distress suffered exists nevertheless.  Temperate conduct may, however, be considered as a mitigating circumstance in determining damages." *Steele,* 478 F.2d at 384.  Pursuant to *Steele* and *Morgan*, plaintiff Shaw is entitled to submit her claim for emotional damages to the jury.  For the same reasons, plaintiffs Johnson, Turner, and Rand are entitled to submit their claims for emotional

distress to the jury. *See* [Doc. 104-3, pp. 14-15; Doc. 103-2, pp. 61:20 to 62:7; 115:15-21; Doc. 97-9, pp. 15-17]. That is, the summary judgment record includes evidence that the remaining plaintiffs suffered anxiety and/or distress as a result of their requests for reasonable accommodation/modification or the Carland Defendants' failure to remediate the curbs.

Second, as to Johnson and Turner's claims for personal injury, "[a] damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis v. Loether*, 415 U.S. 189, 195 (1974). Thus, general tort principles apply. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1167 (9th Cir. 2013). Compensable damages under the FHA include compensation for physical injuries. *Solivan v. Valley Hous. Dev. Corp.*, No. 08-2722, 2009 WL 3763920, at *7 (E.D. Pa. Nov. 9, 2009).

> Oklahoma law
>
> imposes a general duty of care upon landlords to maintain the leased premises, including areas under the tenant's exclusive control or use, in a reasonably safe condition. This duty requires a landlord to act reasonably when the landlord knew or reasonably should have known of the defective condition and had a reasonable opportunity to make repairs.

*Miller v. David Grace, Inc.*, 212 P.3d 1223, 1230 (Okla. 2009). Here, the summary judgment record includes evidence that the Carland Defendants received notice of their tenants' difficulty in accessing driveways and the mountable curbs, as well as their fear of falling, in January of 2017— over a month prior to either Johnson or Turner's fall. [Doc. 140-2]. Whether the Carland Defendants acted reasonably in delaying making modifications or accommodations with respect to the curbs constitutes a question of fact for the jury. *See Saunders v. Smothers*, — P.3d —, 2019 WL 4266024, at **5-6 (Okla. 2019).

Nevertheless, the Carland Defendants argue that they cannot be liable for Turner or Johnson's physical injuries because the mountable curbs were an "open and obvious" danger.  *See Buck v. Del City Apartments, Inc.*, 431 P.2d 360, 365 (Okla. 1965) (landlord only had duty to warn of defects that were not readily ascertainable).  However, the Oklahoma Supreme Court has recognized that "the open and obvious doctrine is not absolute under [Oklahoma] case law." *Wood v. Mercedes-Benz of Okla. City*, 336 P.3d 457, 459 (Okla. 2014).  Rather, a landlord "does have a duty to exercise ordinary care to prevent injury to another whenever the circumstances are such that the owner, as an ordinary prudent person, could reasonably foresee that another will be in danger of injury as a probable consequence of the *owner's actions*." *Id*. at 460 (emphasis in original) (quoting *Brown v. All. Real Estate Grp.*, 976 P.2d 1043, 1045 (Okla. 1999)).  Here, it was reasonably foreseeable that plaintiffs Turner and Johnson would attempt to navigate the curbs and driveways on foot, and in the dark, as it was they only way to leave their units.  Thus, summary judgment is inappropriate. *See Fuqua v. Deer Run Apartments, L.P.,* No. 16-CV-0318-CVE-TLW, 2017 WL 1193061, at *4 (N.D. Okla. Mar. 29, 2017).

C.     *Rehabilitation Act*

The Carland Defendants next contend that plaintiffs cannot establish a *prima facie* case of discrimination under the Rehabilitation Act solely because plaintiffs cannot prove that they were discriminated against. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) (quoting *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004)) ("To make out a prima facie case for discrimination in violation of the Rehabilitation Act, [plaintiffs] must establish:  '(1) that [she] is disabled under the Act; (2) that [she] would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency  . . .); and (4) that the program has discriminated against the plaintiff.").  However, as discussed above,

genuine disputes of material fact exist as to whether the Carland Defendants discriminated against the plaintiffs by failing to design and construct the dwellings in the Community in such a manner that the public use and common use portions of such dwellings are readily accessible to, and usable by, handicapped persons in violation of § 3604(f)(3)(C), and whether defendants failed to provide a reasonable accommodation as the curbs and mailbox access. Thus, the Carland Defendants' motion for summary judgment with respect to Count Three, plaintiffs' Rehabilitation Act claim, is denied.

D.    *Request for Injunctive Relief*

Finally, the Carland Defendants argue that plaintiffs' request for injunctive relief is moot because it is undisputed that, in November and December 2018, Cherokee Meadows, LP retrofitted the mountable curbs by removing them across the driveways to each apartment and replacing them with a sloping driveway. [Doc. 92, p. 10, ¶ 11; Doc. 140, pp. 7-14; Doc. 92-4, p. 4, ¶ 20]. However, as set forth above, plaintiffs' failure to "design and construct" handicap accessible multifamily dwellings pursuant to 42 U.S.C. § 3604(f)(3) claim is not limited to mountable curbs and mailbox access, and includes design and construction features of the units (UFAS and non-UFAS) and certain Community buildings. The Carland Defendants offer no admissible evidence that the units or other Community buildings complied with all applicable accessibility requirements at completion of construction or that, if non-compliant, they have been remediated. Plaintiffs' request for injunctive relief is therefore not moot. The Carland Defendants' request for summary judgment with respect to injunctive relief is denied.

**VI.    Analysis of Redbud Motions**

Redbud moves for partial summary judgment on six grounds common to each plaintiff and two grounds specific to certain plaintiffs. The court separately considers each ground.

*First,* Redbud asserts that "[p]laintiff[s] cannot establish that Redbud engaged in discriminatory conduct under the FHA." [Doc. 105, p. 6; Doc. 106, p. 6; Doc. 107, pp. 5-6; Doc. 108, pp. 5-6]. Although not explicitly framed as such, the court construes this ground to seek summary judgment on plaintiffs' intentional discrimination claims under the FHA. Redbud specifically adopted and incorporated by reference the Carland Defendants' motions for summary judgment. Thus, for the reasons discussed above in section (A)(1) with respect to the Carland Defendants' motions, Redbud is entitled to summary judgment as to plaintiffs' claim of intentional discrimination in violation of §§ 3604(d), (f)(1), (f)(2) premised on failure to permit plaintiffs to rent or inspect non-handicap accessible units, plaintiff Turner's claim that she was initially denied a unit for a discriminatory reason, and plaintiff Rand's claim premised on the rent late-fee policy.

*Second*, Redbud contends that plaintiffs cannot establish a failure to make a reasonable accommodation or retaliation under the FHA because Redbud was "merely the general contractor" and not involved in management of the Community. [Doc. 105, pp. 7-9; Doc. 106, pp. 7-10; Doc. 107, pp. 7-9; Doc. 108, pp. 6-9]. However, plaintiffs submit evidence to create a genuine dispute as to whether at least one request for accommodation was sent to Redbud related to the curbs and mailbox access. [Doc. 140-6]. Further, as discussed above, plaintiffs submit sufficient evidence so as to create a genuine dispute as to whether plaintiffs were denied a request for reasonable accommodation in the form of curb remediation and mailbox access. Thus, Redbud is not entitled to summary judgment on plaintiffs' request for reasonable accommodation theory of recovery premised on curb remediation and mailbox access. However, as previously stated, plaintiffs fail to create a genuine dispute of material fact as to Rand's individual requests for reasonable accommodation premised on waiver of late fees and provision of a permanent landline. Thus,

Redbud is also entitled to summary judgment as to those theories of recovery for the reasons set forth above.

As for plaintiffs' retaliation theory of recovery, for the reasons discussed above, plaintiffs Turner, Johnson, and Rand fail to demonstrate a genuine dispute of material fact. Further, as to all plaintiffs, the parties stipulated that Redbud Contractors, LLC served as the general contractor of the Cherokee Meadows project, and that Carland Properties, LLC was the management company responsible for the Community's operations. [Doc. 34, p. 5]. Further, plaintiffs offer no evidence that Redbud acted in a retaliatory manner toward Shaw (or any other plaintiff). Accordingly, Redbud is entitled to summary judgment as to plaintiffs' retaliation claim.

*Third*, Redbud seeks summary judgment as to plaintiff Shaw and Rand's "steering" theory of recovery. For the reasons discussed above, no genuine dispute of material fact exists. Thus, Redbud is entitled to summary judgment.

*Fourth,* Redbud argues that plaintiffs are not entitled to punitive damages under the FHA. Redbud first argues that it is not involved in the leasing or operation of the Community. However, plaintiffs present evidence so as to create a genuine dispute of material fact as to whether Redbud denied their request for reasonable accommodation regarding the curbs and mailbox access. Additionally, Redbud argues that plaintiffs fail to present evidence that the alleged wrongdoing rose to the level of culpability necessary for the imposition of punitive damages. However, as discussed above, viewing the evidence in the light most favorable to plaintiffs, a genuine dispute of material fact exists as to whether Redbud acted in knowing and reckless indifference to the plaintiffs' federally protected rights by unreasonably delaying remediation of the curbs and mailbox access. *Compare* [Doc. 140-6] *with* [Doc. 92-5; 92-6]. The propriety of punitive damages

presents a question of fact that cannot be resolved on the summary judgment record before the court.

*Fifth*, Redbud contends that plaintiffs are not entitled to emotional distress damages against Redbud under the FHA. Redbud makes two general arguments. First, Redbud argues that plaintiffs' stress and anxiety were not caused by any action of Redbud. However, as previously stated, a genuine dispute exists as to whether Redbud denied plaintiffs' request for reasonable accommodations. Second, Redbud characterizes plaintiffs' complaints as "minor annoyances" for which damages are not recoverable as a matter of law. But the Tenth Circuit has stated that damages may be permissible even if the conduct is not vindictive or abusive. *See Steele*, 478 F.2d at 384. Thus, plaintiffs are entitled to submit their requests for emotional distress damages to the jury, and Redbud is not entitled to summary judgment.

*Sixth*, against only Turner and Johnson, Redbud seeks summary judgment as to the claim for personal injury damages. [Doc. 107, p. 11; Doc. 108, pp. 10-11]. In doing so, Redbud "fully adopts and incorporates by reference the arguments of the Carland Defendants in their Motion for Partial Summary Judgment," and raise no new arguments. [*Id.*]. For the reasons discussed above, summary judgment is inappropriate. *See Fuqua*, 2017 WL 1193061, at *4.

*Seventh*, Redbud adopts and incorporates by reference the collective arguments of the Carland Defendants to assert that plaintiffs cannot establish a *prima facie* case of discrimination under the Rehabilitation Act. Thus, for the reasons discussed above, summary judgment is inappropriate. Further, a genuine dispute of material fact exists as to whether Redbud failed to construct the Community to permit ready accessible to, and use by, handicapped persons and whether Redbud failed to provide a reasonable accommodation as to the curbs and mailbox access.

*Eighth*, Redbud adopts and incorporates the arguments raised by the Carland Defendants that plaintiffs' request for injunctive relief is moot. As set forth above, defendant is not entitled to partial summary judgment on plaintiffs' prayer for injunctive relief.[19]

*Finally,* Redbud asserts that plaintiffs cannot establish a breach of contract claim against it premised on the Land Use Restriction Agreement ("LURA") because it was not a party to the agreement. The court agrees. Under Oklahoma law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." OKLA. STAT. tit. 15, § 152. It is undisputed that the LURA states: "[t]his regulatory agreement for Low-Incoming Housing Tax Credits Restrictive Covenants (the "Agreement") is made and entered into effective as of the 1st day of January, 2017, by and between Cherokee Meadows, LP, and its successors and Transferees (the 'Owner') and OKLAHOMA HOUSING FINANCING AGENCY, a public trust ('OHFA')." [Doc. 108-1, p. 5].

Interpreting the LURA pursuant to its plain language and to give effect to the intention of the parties, the LURA constitutes an agreement between Cherokee Meadows, LP and OHFA. Redbud is not a party to that agreement. Further, in response, plaintiffs offer no evidence or argument to the contrary. Thus, Redbud is entitled to summary judgment as to Count 5, plaintiffs' breach of contract claim.

## VII. Conclusion

WHEREFORE, the Motions for Partial Summary Judgment of defendants Cherokee Meadows, LP; Carland Group, LLC; and Carland Properties, LLC against Plaintiff Della Shaw

---

[19] Redbud also contends that Shaw's request for declaratory relief is moot. However, the Carland Defendants' motions included no argument directed to plaintiffs' request for declaratory relief. By incorporating by reference the Carland Defendants' motion, Redbud therefore also fails to raise any argument with regard to the request for declaratory relief.

[Doc. 92]; against Plaintiff Mary Rand [Doc. 97]; against Plaintiff Sherlyne Turner [Doc. 103]; and against Plaintiff Bertha Johnson [Doc. 104] are granted in part and denied in part. The motions are granted as to the following: Count 2 – intentional discrimination in violation of §§ 3604(d), (f)(1), (f)(2) premised on failure to permit plaintiffs to rent or inspect non-handicap accessible units, plaintiff Turner's claim that she was initially denied a unit for a discriminatory reason, and plaintiff Rand's claim premised on the rent late-fee policy; Count 2 – steering in violation of §§ 3604(a), (f)(1); denial of reasonable accommodation in violation of § 3604(f)(3)(B) premised on Rand's individual theories related to waiver of late fees and provision of a permanent landline; and plaintiffs Rand, Turner, and Johnson's claim of retaliation in violation of § 3617. The motions are otherwise denied.

Defendant Redbud Contractors, LLC's Motion for Partial Summary Judgment Against Plaintiff Della Shaw [Doc. 105]; Motion for Partial Summary Judgment Against Plaintiff Mary Rand [Doc. 106]; Motion for Partial Summary Judgment Against Plaintiff Sherlyne Turner [Doc. 107]; and Motion for Partial Summary Judgment Against Plaintiff Bertha Johnson [Doc. 108] are granted in part and denied in part. The motions are granted as to the following: Count 2 – intentional discrimination in violation of §§ 3604(d), (f)(1), (f)(2) premised on failure to permit plaintiffs to rent or inspect non-handicap accessible units, plaintiff Turner's claim that she was initially denied a unit for a discriminatory reason, and plaintiff Rand's claim premised on the rent late-fee policy; Count 2 – steering in violation of §§ 3604(a), (f)(1); denial of reasonable accommodation in violation of § 3604(f)(3)(B) premised on Rand's individual theories related to waiver of late fees and provision of a permanent landline; plaintiffs' claim of retaliation in violation of § 3617; and Count 5 – breach of contract. The motions are otherwise denied.

DATED this 30th day of December, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE