IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DELLA SHAW, SHERLYNE TURNER, BERTHA JOHNSON, and MARY RAND, <br><br>　　　　Plaintiffs, <br><br>v. <br><br>CHEROKEE MEADOWS, LP; CARLAND GROUP, LLC; REDBUD CONTRACTORS, LLC; CARLAND PROPERTIES, LLC; and BLACKLEDGE & ASSOCIATES, <br><br>　　　　Defendants. | Case No. 17-CV-610-GKF-JFJ |
| CHEROKEE MEADOWS, LP and CARLAND GROUP, LLC, <br><br>　　　　Third-Party Plaintiffs, <br><br>v. <br><br>CRAFTON TULL & ASSOCIATES, INC., <br><br>　　　　Third-Party Defendant. | |

**OPINION AND ORDER**

This matter comes before the court on the Motion for Summary Judgment [Doc. 93] of defendant Blackledge & Associates. For the reasons set forth below, the motion is granted in part and denied in part.

**I.     Background and Procedural History**

This case arises from alleged violations of the Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), Rehabilitation Act, and Uniform Federal Accessibility Standards ("UFAS") at the Cherokee Meadows Apartments. Cherokee Meadows Apartments is a forty-eight

(48) unit multi-family, affordable housing community (the "Community") for persons aged sixty-two or older developed in 2016 by Carland Group, LLC and owned by Cherokee Meadows, LP. Plaintiffs allege Blackledge & Associates provided architectural and design services for the Community. Plaintiffs are tenants of Cherokee Meadows Apartments who allege that the Community includes artificial barriers that exclude persons with disabilities and do not comply with federal statutes. Plaintiffs further allege that defendants refused to grant reasonable accommodation requests.

Based on these general allegations, the Complaint asserts the following claims against defendants: (1) failure to design and construct the public use and common use portions of the Community in a readily accessible and usable manner to handicapped persons in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C); (2) discrimination based on handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f); (3) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (4) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132 by designing, constructing, and maintaining housing that is not accessible to persons with disabilities; and (5) breach of contract. Pursuant to the order of June 8, 2018, the court dismissed the claim for violation of the Americans with Disabilities Act, 42 U.S.C. § 12132, against Blackledge. [Doc. 46]. Blackledge now seeks summary judgment as to plaintiffs' remaining claims against it. [Doc. 93]. Plaintiffs filed a response to Blackledge's motion [Doc. 119], and Blackledge filed a reply. [Doc. 135]. Thus, the motion is ripe for the court's review.

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, "[t]he evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party." *Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir. 2004). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson,* 477 U.S. at 249). Summary judgment is appropriate only "where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Stover,* 382 F.3d at 1070 (quoting FED. R. CIV. P. 56(c)).

## III. Summary Judgment Analysis

As previously stated, Blackledge seeks summary judgment as to the following claims: (1) failure to design and construct the public use and common use portions of the Community in a readily accessible and usable manner to handicapped persons in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C); (2) discrimination based on handicap in violation of the Fair Housing Act, 42 U.S.C. § 3604(f); (3) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and (4) breach of contract.

A.     *Count 1 – Fair Housing Act, 42 U.S.C. § 3604(f)(3)(C)*

Section 3604(f) of the Fair Housing Act ("FHA") prohibits discrimination in the sale or rental of any dwelling because of handicap. 42 U.S.C. § 3604(f). Plaintiffs first assert a specific claim under § 3604(f)(3)(C) that Blackledge failed to design and construct the Community dwellings in such a manner that the public use and common use portions were readily accessible to, and usable by, handicapped persons. Section 3604(f) of the Fair Housing Act ("FHA") defines "discrimination" to include:

> in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that—
>
> (i)     the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;
>
> (ii)    all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and
>
> (iii)   all premises within such dwellings contain the following features of adaptive design:
>
> > (I)    an accessible route into and through the dwelling;
> >
> > (II)   light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;
> >
> > (III)  reinforcements in bathroom walls to allow later installation of grab bars; and
> >
> > (IV)   usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

42 U.S.C. § 3604(f)(3)(C). "Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1') suffices to satisfy the requirements of paragraph (3)(C)(iii)." 42 U.S.C. § 3604(f)(4). Further, a designer or builder may comply with

the FHA's requirements through compliance with accessibility standards incorporated into law by a state or local government.[1] 42 U.S.C. § 3604(f)(5)(A).

In its motion, Blackledge argues that its role in the Community was limited to that of a design architect and, because the architectural design of the Community complied with the requirements of § 3604(f)(3) (regardless of whether the Community as constructed was compliant), is therefore entitled to summary judgment. In response, plaintiffs contend that Blackledge's role at the Community included design of a handicap accessible route, including sidewalks, and that Blackledge possessed the authority to supervise the general contractor, Redbud.

The traditional tort law principle of proximate cause applies to a claim for damages under the FHA. *See Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017). In the context of the FHA, the determinative question is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133 (2014)). A defendant may be liable only for participation in the *actual wrongdoing* that causes the harm. Mere participation in the project is insufficient to impose liability. *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 3 F. Supp. 2d 661, 665, 665 n.2 (D. Md. 1998); *see also Barker v. Niles Bolton Assocs., Inc.*, 316 F. App'x 933, 942 (11th Cir. 2009). Thus, the court must first determine the scope of Blackledge's role at the Community to determine whether any of the alleged wrongdoing falls within the scope of Blackledge's responsibility.

---

[1] It has not been established that the City of Tulsa incorporated the FHA's requirements into its building codes and ordinances.

The court looks to the agreement of the parties to determine the scope of the duty undertaken by Blackledge.[2] *Waggoner v. W&W Steel Co.*, 657 P.2d 147, 150 (Okla. 1983). Under Oklahoma law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." OKLA. STAT. tit. 15, § 152.

> The interpretation of a contract, and whether it is ambiguous is a matter of law for the Court to resolve. Contractual intent is determined from the entire agreement. If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended. The Court will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision.

*Whitehorse,* 156 P.3d at 47 (internal footnotes omitted); *see also* OKLA. STAT. tit. 15, § 155.

It is undisputed that, on February 24, Cherokee Meadows, LP, as Owner, and Blackledge, as Architect, executed the AIA Document B101 – 2007 Standard Form of Agreement Between Owner and Architect ("Agreement"). [Doc 94-2]. The Agreement required Blackledge to provide certain "professional services" as set forth therein. [Doc. 94-2, p. 3, § 2.1]. With respect to "Construction Phase Services," the Agreement required, in part, that "[t]he Architect shall provide

---

[2] Plaintiffs point to extrinsic evidence including the Application for Tax Credits and certain correspondence issued by Blackledge as evidence that Blackledge "had authority to direct the actions of the contractor, Redbud." [Doc. 119, p. 9]. However, under Oklahoma law, the interpretation of an unambiguous contract is a question of law for the court, and the court is limited to the language of the contract itself. *Whitehorse v. Johnson*, 156 P.3d 41, 47 (Okla. 2007); *see also* OKLA. STAT. tit. 15, § 155 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible."). Plaintiffs do not argue that the language of the Agreement is ambiguous. *See generally* [Doc. 119]. Further, with respect to the evidence submitted by plaintiffs, the Application for Tax Credits describing $12,000 in compensation to the architect for supervision services predates the Agreement. *See* [Doc. 119-3]. In addition, for the reasons set forth in the court's order of December 30, 2019, extrinsic evidence regarding the design and construction of other subsidized housing projects is inadmissible. *See* [Doc. 159]. Thus, the court relies only on the language of the Agreement itself to interpret the document.

administration of the Contract between the Owner and the Contractor as set forth below." [*Id.* at p. 6, § 3.6.1.1]. In the section immediately subsequent thereto, the Agreement required as follows:

> The Architect shall advise and consult with the Owner during the Construction Phase Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement. The Architect shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, *nor shall the Architect be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents*. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of, and shall not be responsible for, acts or omissions of the Contractor or of any other persons or entities performing portions of the Work.

[*Id.* § 3.6.1.2 (emphasis added)].

Further, the Agreement required Blackledge to perform certain evaluations of the work, specifically:

> The Architect shall visit the site at intervals appropriate to the stage of construction, *or as otherwise required in Section 4.3.3*, to become generally familiar with the progress and quality of the portion of the Work completed, and to determine, in general, if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. *However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work.* On the basis of the site visits, the Architect shall keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and report to the Owner (1) known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor, and (2) defects and deficiencies observed in the Work.

[*Id.* § 3.6.2.1 (emphasis added)]. Section 4.3.3 required Blackledge to visit the site during construction "[a]s required for Application for Payment," and "[a]s [n]eeded" to inspect "any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents." [*Id.* at p. 10, § 4.3.3(2), (3)]. Specifically, the Agreement required Blackledge to "conduct inspections to determine the date or dates of Substantial Completion and the date of final completion; issue Certificates of Substantial

Completion; receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor; and issue a final Certificate of Payment based upon a final inspection indicating the work complies with the requirements of the Contract Documents." [*Id.* at p. 8, § 3.6.6.1]. Additional services provided by Blackledge include "[o]n-site project representation" and "[c]oordination of Owner's consultants." [*Id.* at p. 9, § 4.1.12, 4.1.19].

Although the plain language of the Agreement imposes some duty on Blackledge to inspect the work at the Community, such duty is clearly limited. First and significantly to this court, pursuant to the Agreement, Blackledge is expressly absolved of any responsibility for the "Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents." [*Id.* at p. 6, § 3.6.1.2]. Further, although the Agreement contemplates that Blackledge will visit the site at certain intervals, such inspections are specifically limited to only "as required" upon Contractor's application for payment and to inspect the work for substantial completion in accordance with the requirements of the Contract Documents. [*Id.* at p. 10, § 4.3.3]. Pursuant to the Agreement, Blackledge "shall not be required to make exhaustive or continuous on-site inspections to check the quality or the quantity of the Work." [*Id.* at p. 6, § 3.6.2.1; *see also id.* at p. 7, § 3.6.3.2 (issuance of Certificate of Payment "shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work . . . .")]. Thus, although the Agreement may impose a limited duty to inspect, "exhaustive, continuous on-site inspections were not required." *Watson, Watson, Rutland/Architects, Inc. v. Montgomery Cty. Bd. of Educ.*, 559 So. 2d 168, 174 (Ala. 1990).

Plaintiffs offer no evidence that Blackledge knew of any deviations from its design in construction of the Community prior to certification of substantial completion. Nor do plaintiffs

submit any evidence from which the court may infer that Blackledge wholly failed to inspect the Community or that the alleged defects were such that "even the most perfunctory monitoring would have been prevented." *Watson, Watson, Rutland/Architects, Inc.*, 559 So. 2d at 174. Rather, plaintiffs seemingly seek to impose liability on Blackledge for failing to inspect *and to discover* deviations from the architectural plans. The court does not construe the Agreement to impose this broad requirement. Thus, based on the summary judgment record before the court, Blackledge cannot be liable for breach of the limited duty to inspect owed under the Agreement. Accordingly, Blackledge may only be liable to the extent that the *design* of the Community—rather than its construction—violated the FHA.[3] *See Bank of Am. Corp.,* 137 S. Ct. at 1305.

Blackledge presents submits the October 11, 2018 expert report of Mark A. Thomas, AIA, Architects Collective, that the following design elements complied with all applicable accessibility standards: closet doors, roll in showers, shower grab bars, garage doors, garage door openers, and upper kitchen cabinet distance from the floor in handicap accessible units; unit closets, ceiling fan speed controls, thermostat controls, and countertop outlets in non-handicap accessible units; as well as thresholds at primary entry doors at the Community Building and Units; Community Building kitchen sink; the driveway design providing adequate clearance for the accessible route; Community Building Business Center work surfaces; Community Building men and women's restroom doors; and Community Building men's lavatory.

In response, plaintiffs assert that genuine disputes of material fact exist with respect to whether Blackledge's design complied with accessibility requirements relative to these features,

---

[3] Blackledge argues at length in reply that plaintiffs have taken the position throughout this litigation that the architectural design was not at issue. [Doc. 135, pp. 9-12]. However, Blackledge's position is belied by the Complaint which refers to the inaccessibility of the design over fifteen times. *See generally* [Doc. 2].

and direct the court to the architectural plans for the Community as the sole evidence of the existence of a genuine dispute. [Doc. 119, pp. 4-7]. Plaintiffs offer no expert testimony interpreting the plans. Instead, plaintiffs argue that expert testimony is unnecessary because "[a] jury should be able to discern whether or not the lines and measurements written on the plans comply with the specific and plain language requirements of the UFAS and Fair Housing Act Design Manual." [Doc. 119, p. 9]. Under Oklahoma law, "[t]he general rule is expert testimony is ordinarily necessary to establish causation in professional liability cases." *Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976) (internal footnote omitted). However, "when a [professional's] lack of care has been such as to require only common knowledge and experience to understand and judge it, expert . . . testimony is not required to establish that care." *Id.*; *see also* FED. R. EVID. 701 (opinion testimony by lay witness is admissible if it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). The UFAS and Fair Housing Act accessibility standards require technical or otherwise specialized knowledge that generally falls outside the knowledge or understanding of a lay person. *See generally Reyen v. Jones Lang Lasalle Americas, Inc.*, No. CCB-15-1548, 2016 WL 4662335, at *6 (D. Md. Sept. 7, 2016) (expert testimony required when statute such as the ADA provides standard of care). Thus, with respect to the foregoing issues, expert testimony is required. Plaintiffs do not submit expert evidence to rebut Thomas's opinions and therefore Blackledge is entitled to summary judgment with respect to those issues.[4]

---

[4] To the extent that plaintiffs would rely on the Accessibility Compliance Report of plaintiffs' expert Mariesha A. Blazik, dated September 26, 2018, Blazik's scope of work specifically excludes "plan reviews of building plans, site plans, or construction documents," and Blazik states the drawings provided were "used for diagrammatic and reference purposes only to determine the building footprints, general site information, and unit plan layouts in support of field observations. *Blazik's survey is based on the field conditions observed on survey date*." [Doc. 94-11, p. 11 (emphasis added)]. Thus, Blazik offers no expert opinions as to whether Blackledge's plans

However, a genuine dispute of material fact exists as to whether the design of the toilet unobstructed floor space is somehow interrupted by the upper cabinet mounted above the toilet in units, whether the design of the toilet rear grab bars in the handicapped units were the required 36" in length and appropriately located from the centerline of the toilet, whether the non-UFAS bathing facilities violate the FHA Design Manual because they were 30" x 60", and whether the units included the required consumer information. *See* [Doc. 94-8]. With respect to the toilet unobstructed floor space, Thomas states that "[i]f a tenant objects to the upper cabinet, it can be removed," but does not explicitly opine that Blackledge's design complied with the applicable standards. [*Id.* at p. 5]. Thomas admits that the 36" rear grab bar requires remediation and that the design documents include conflicting information as to installation of the bar. [*Id.* at p. 6]. Thomas offers no opinions with respect to the 30" x 60" non-UFAS bathing facilities and consumer information.[5] Thus, a genuine dispute of material fact exists and plaintiffs are entitled to submit these issues to the jury.

Further, a genuine dispute of material fact exists as to whether Blackledge's design of the exterior accessible route and sidewalks complied with applicable accessibility requirements. Blackledge argues that third-party defendant Crafton Tull provided civil engineering services at the Community and therefore Crafton Tull, not Blackledge, is responsible for any accessibility concerns related to the sidewalks. The court agrees that Crafton Tull was responsible for civil engineering and design services at the Community. However, there is evidence from which a

---

complied with applicable accessibility standards, and therefore her report does not create a genuine dispute of material fact.

[5] In reply, Blackledge attaches portions of the FHA Design Manual as evidence that the non-UFAS bathing facilities are compliant. *See* [Doc. 135-7]. However, the rules do not permit, and the court generally does not consider, new material attached to a reply brief.

reasonable juror could conclude that Blackledge, rather than Crafton Tull, assumed responsibility for the *placement or general location* of the sidewalks and exterior accessible route. [Doc. 119-2, p. 9, § 4.1.8; Doc. 119-5, pp. 2-3; Doc. 119-10, p. 4; Doc. 119-11; Doc. 119-12; Doc. 119-16, p. 5 ("Contractor shall refer to architectural plans for exact locations and dimensions of vestibules, slope paving, sidewalks, exit porches, truck docks, precise building dimensions, and exact utility entrance locations.")]. Plaintiffs' expert Blazik opines that the exterior accessible route was not compliant due to a lack of curb ramps and lack of connecting accessible routes throughout the property. [Doc. 94-11, p. 12]. Thus, residents were required to travel significant distances to reach common use amenities. [*Id.*].[6] Although Blazik's opinions relate to the Community as constructed, rather than as designed, discerning the placement and general location of the sidewalks and exterior accessible routes on the architectural plans does not require scientific, technical, or other specialized knowledge. *See* FED. R. EVID. 701. Unlike the interior UFAS requirements discussed above, identifying the location of the sidewalks and exterior accessible route on the plans does not require a layperson to decipher complicated dimensions or measurements, or to refer back and forth between multiple sheets and "HC Accessible Notes." Rather, a juror need only rely on its common knowledge and experience to identify the location of the routes in the architectural drawings. Thus, plaintiffs' failure to submit expert evidence as to the general location of the sidewalk and exterior accessible route in the architectural designs does not require summary judgment in Blackledge's favor.

Because evidence exists that Blackledge assumed responsibility for placement of the sidewalks and exterior accessible route at the Community and, further, that the exterior access was

---

[6] The court notes that Blackledge does not challenge Blazik's qualifications as a FHA or UFAS expert.

noncompliant due, in part, to improper placement or general location of the sidewalks and walkways, a genuine dispute of material fact exists. Blackledge is not entitled to summary judgment related to plaintiffs' § 3604(f)(3)(C) claim premised on failure to provide an accessible exterior route throughout the Community.

B. Count 2 – Fair Housing Act, 42 U.S.C. § 3604(f)

Blackledge next contends that it is entitled to judgment on all theories of recovery included in Count 2. As discussed in the Court's Order on the Carland Defendants' motions for summary judgment, Count 2 of the Complaint does not expressly set forth many of the theories of recovery argued by defendants on summary judgment. However, in that Order, based on the parties' briefing, the court analyzed the following theories of recovery: failure to rent or inspect in violation of § 3604(d) and (f)(1); discrimination in the "terms, conditions, or privileges" of rental of the dwelling under § 3604(f)(2); steering in violation of § 3604(a), (f)(1); denial of a request for reasonable accommodation pursuant to § 3604(f)(3)(B); and retaliation pursuant to § 3617.

Regardless of the theory of recovery, Blackledge argues that it is entitled to summary judgment because Blackledge's design did not violate § 3604(f) and, further, Blackledge did not have a duty to act as project supervisor or manager of the Community after construction. The *McDonnell Douglas* burden-shifting framework applies to plaintiffs' theories of recovery in Count 2. *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012).[7]

---

[7] Unlike with respect to the Carland Defendants' motions for summary judgment, plaintiffs do not assert that they present direct evidence of discrimination. Further, as set forth in the court's Order on the Carland Defendants' motions for summary judgment, plaintiffs' evidence does not constitute direct evidence of discrimination. *See* [Doc. 158 at pp. 18-19].

Pursuant to the *McDonnell Douglas* analysis, "plaintiff first must come forward with proof of a prima facie case of discrimination." *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989). If the plaintiff establishes a prima facie case, the burden shifts to defendants to produce evidence that the alleged discriminatory conduct was motivated by legitimate, non-discriminatory considerations. *Id.* "[O]nce defendants by evidence articulate non-discriminatory reasons, the burden shifts back to plaintiff to show that the proffered reasons were pretextual." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

In order to establish a *prima facie* case of discrimination based on handicap under the FHA, plaintiffs must prove that: (1) they are handicapped; (2) that they applied for and were qualified to rent a unit in the Community; (3) they were denied the opportunity to rent or inspect a unit; and (4) the housing opportunity remained available. *Id.* at 1280; *see also Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 375 (E.D.N.Y. 2008).

Plaintiffs submit no evidence that Blackledge denied them the opportunity to rent or inspect a unit, that Blackledge created or administered Cherokee Meadows's rent-payment policy, or that Blackledge assigned plaintiffs Shaw or Rand to a handicap accessible unit. Rather, Blackledge submits undisputed evidence that Carland Properties, LLC is the management company that operates the Community, and that Blackledge was not responsible for the day-to-day operations or management of the Community. [Doc. 94, p. 9, ¶ 8; Doc. 119, pp. 2-7; Doc. 94-1, ¶¶ 6-7; Doc. 94-2]. Thus, no genuine dispute of material fact exists, and Blackledge is entitled to summary judgment on plaintiffs' § 3604(d), (f)(1) discrimination in rental or inspection theory; § 3604(f)(2) discrimination in the "terms, conditions, or privileges" of rental theory; steering; and retaliation theories.

With respect to the plaintiffs' denial of reasonable accommodation theory, to establish a claim of discrimination under the FHA for failure to accommodate, plaintiffs must demonstrate: (1) that they are handicapped as defined by the FHA; (2) that defendants knew or reasonably should have known of the claimed handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendants refused to make such accommodation. *Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016) (citing *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)). Plaintiffs present no evidence that they directed a request for reasonable accommodation to Blackledge, nor that Blackledge denied such request. It is axiomatic that, in order to be entitled to a reasonable accommodation from Blackledge, plaintiffs must request that such accommodation be made. *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Modification Under the Fair Housing Act*, pp. 9 (Mar. 5, 2008); *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations Under the Fair Housing Act*, p. 11 (May 17, 2004). Nor can liability be imposed until the accommodation request is denied. *See Arnal*, 226 F. Supp. 3d at 1186 (citing 42 U.S.C. §§ 3604(f)(3)(B), 3613(c)(1)). Because plaintiffs submit no evidence that they (1) requested a reasonable accommodation from Blackledge, or (2) that such request was denied, Blackledge is entitled to summary judgment as to this theory of recovery.

Count 2 generally asserts discrimination "in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of handicap." [Doc. 2, p. 23]. The undisputed evidence demonstrates that Blackledge assumed responsibility for the architectural design of the Community, but that Blackledge's responsibilities

did not include provision of the terms, conditions, or privileges of actually leasing or managing the units after completion of construction. Thus, no genuine dispute of material facts exists and Blackledge is entitled to summary judgment as to plaintiffs' Count 2.

C. *Count 3 – Rehabilitation Act*

Blackledge next contends that it is entitled to summary judgment as to plaintiffs' claim under the Rehabilitation Act, 29 U.S.C. § 794. "To make out a prima facie case for discrimination in violation of the Rehabilitation Act, [plaintiffs] must establish: '(1) that [she] is disabled under the Act'; (2) that [she] would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency . . .); and (4) that the program has discriminated against the plaintiff." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010) (quoting *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004)). Blackledge argues that plaintiffs fail to establish the third and fourth requirements—receipt of federal financial assistance and discrimination against plaintiffs by Blackledge. The court first considers the receipt of federal funds requirement.

Plaintiff submits evidence from which a reasonable finder of fact could infer that Cherokee Meadows LP received federal HOME funds, and that Cherokee Meadows used those funds in the construction of the Community. [Doc. 119-1]. Further, it is undisputed that Cherokee Meadows, LP and Blackledge executed the Agreement for the provision of professional architectural services for construction of the Community. [Doc. 94-2]; *see also* 42 U.S.C. § 12742(a) (eligible use of HOME funds include new construction costs); 24 C.F.R. § 92.206(d) (new construction costs include architectural services). As previously discussed by this court in its June 8, 2018 Order on Blackledge's motion to dismiss, the HUD implementing regulation does not distinguish between direct and indirect receipt of federal funds. *See Bishop v. Children's Ctr. for Developmental*

*Enrichment,* No. 08-CV-766, 2011 WL 4337088, at *7 (S.D. Ohio Sept. 15, 2011). Thus, a genuine dispute of material fact exists as to Blackledge's receipt of federal funds, and Blackledge is not entitled to summary judgment on this basis.

As to discrimination, Blackledge "incorporates by reference" its analyses put forth in its prior propositions. Other district courts in this Circuit have analyzed Fair Housing Act and Rehabilitation Act claims under the same standards. *See Roe v. Hous. Auth. of the City of Boulder*, 909 F. Supp. 814, 820-21 (D. Colo. 1995); *see also Valencia v. City of Springfield*, 883 F.3d 959, 967 (7th Cir. 2018). Thus, for the same reasons as set forth above, genuine disputes of material fact exists regarding the design of the toilet unobstructed floor space and upper cabinet in the units, the design of the toilet rear grab bars in the handicapped units, whether the non-UFAS bathing facilities violate the FHA Design Manual, whether the units included the required consumer information, and whether the *placement or general location* of the sidewalks and exterior access route complied with applicable accessibility requirements. Blackledge is otherwise entitled to summary judgment as to this claim for the reasons discussed above.

   D.   *Count 5 – Breach of Contract*

Finally, Blackledge argues that it is entitled to summary judgment as to plaintiffs' claim for breach of the Land Use Restriction Agreement ("LURA") because Blackledge was not a party to that agreement. Blackledge relies on the statement in the Agreement that "[t]his regulatory agreement for Low-Incoming Housing Tax Credits Restrictive Covenants (the 'Agreement') is made and entered into effective as of the 1st day of January, 2017, by and between Cherokee Meadows, LP, and its successors and Transferees (the 'Owner') and OKLAHOMA HOUSING FINANCE AGENCY, a public trust ('OHFA')." [Doc. 94-4, p. 5].

In response, plaintiffs argue that Blackledge may be liable for breach of the LURA because Blackledge executed a certification for the Carland Defendants' Tax Credit Application, and the LURA "incorporates" and, was made in reliance on, the certifications contained in the Tax Credit Application. The court is not persuaded.

*First,* the LURA does not incorporate by reference the entirety of the Application. Rather, the Agreement explicitly incorporates the Additional Certifications of Owner, attached to the LURA as Exhibit "A." [Doc. 94-4, p. 5]. Blackledge's signature does not appear in the Additional Certifications of Owner incorporated as Exhibit A. [*Id.* at pp. 34-36].

*Second,* even assuming the LURA incorporated the entirety of the Application, OHFA's reliance thereon does not render Blackledge a party to the LURA. Under Oklahoma law, although a contract incorporates an extrinsic document, "basic principals of contract law remain fundamentally unchanged." *Walker v. Builddirect.com Techs., Inc.,* 349 P.3d 549, 553 (Okla. 2015). Thus, the court must ascertain the intent of the parties from the four corners of the LURA. *Id.* at 554. Looking to the plain language of the document, OHFA's reliance on the Application is limited to the representations of the Owner—*i.e.*, Cherokee Meadows, LP—not those of third-parties. *See* [Doc. 94-4, pp. 6 and 11, §§ 1.1.1, 6.2]. "[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277-78 (1916) (collecting cases). Nothing in the LURA suggests that incorporation of any extrinsic documents was intended to expand the LURA to include additional parties. Rather, the LURA explicitly states that it is between "Cherokee Meadows, LP," its transferees and successors, and OHFA. That the certifications and LURA relate to the same project is not enough for the court to adopt a strained

construction of the LURA's plain language so as to render Blackledge a party thereto. Blackledge is therefore entitled to summary judgment as to plaintiffs' breach of contract claim.

IV. **Conclusion**

WHEREFORE, Defendant Blackledge & Associates' Motion for Summary Judgment [Doc. 93] is granted in part and denied in part. It is granted in its entirety as to Count 2 and Count 5. It is denied as to Count 1 and it is denied as to Count 3 to the extent premised on whether the design of the toilet unobstructed floor space is interrupted by the upper cabinet mounted above the toilet in units, whether the design of the toilet rear grab bars in the handicapped units were the required 36" in length and appropriately located from the centerline of the toilet, whether the non-UFAS bathing facilities violate the FHA Design Manual because they were 30" x 60", and whether the units included the required consumer information, as well as whether the placement and general location of the sidewalks and exterior accessible routes complied with applicable accessibility requirements. The motion is otherwise granted as to Count 1 and Count 3.

DATED this 30th day of December, 2019.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE